# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 16, 2015                Decided July 24, 2015

No. 14-1144

INOVA HEALTH SYSTEM,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 14-1176

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Maurice Baskin* argued the cause and filed the briefs for petitioner.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

Before: ROGERS and MILLETT, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Inova Health System ("Inova") operates several hospitals in Northern Virginia. In June 2014, the National Labor Relations Board ruled that Inova had unlawfully discharged, disciplined, or failed to promote certain nurses because they had engaged in concerted activities protected by the National Labor Relations Act, 29 U.S.C. § 158(a)(1). Inova views the events at issue differently and asks this court to overturn the Board's decision. That we cannot do. Our review of such Board decisions is narrow and "highly deferential." *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 419 (D.C. Cir. 1996). Because each of the Board's determinations is reasoned and supported by substantial evidence, we must deny the petition for review and grant the Board's petition for enforcement, regardless of whether we might "'have reached a different result had we considered the question *de novo*.'" *Id.* (quoting *Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994)).

## I

### Statutory Background

The National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, protects the right of employees to engage in "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining[.]" *Id.* § 157. But the Act's protections are not limited to such union-related activities. The Act also grants employees the right "to engage in other

concerted activities for the purpose of * * * mutual aid or protection." *Id.* "Other concerted activities" are actions "undertaken" by an employee "with or on the authority of other employees, and not solely on behalf of the employee himself." *Citizens Inv. Services Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005). And those concerted activities will be for "mutual aid or protection" if they "relate to legitimate employee concerns about employment-related matters." *Tradesman Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) (internal quotation marks omitted); *Venetian Casino Resort v. NLRB*, 484 F.3d 601, 606 (D.C. Cir. 2007) ("'[M]utual aid or protection' * * * include[s] employee efforts to 'improve terms and conditions of employment or otherwise improve their lot as employees[.]'") (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978)). Put plainly, the Act "protect[s] the right of workers to act together to better their working conditions." *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962).

To that end, the Act prohibits all employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of th[ose] rights." 29 U.S.C. § 158(a)(1). If an employer runs afoul of that prohibition, the aggrieved employee can file an unfair labor practice charge with the local Regional Director of the National Labor Relations Board. 29 C.F.R. § 101.2. If the Regional Director determines that the charge has merit, then that Director can file a formal complaint against the employer. 29 U.S.C. § 160(b); 29 C.F.R. § 101.8. An administrative law judge ("ALJ") will hear the case and issue a decision that makes factual findings, credibility determinations, legal conclusions, and a remedial recommendation. *See* 29 C.F.R. §§ 101.10(a), 101.11(a).

Either party may seek review of the ALJ's decision by the Board, 29 C.F.R. § 101.11(b), which generally sits in three-member panels, 29 U.S.C. § 153(b); *New Process Steel v. NLRB*, 560 U.S. 674, 688 (2010) (Board's power can be vested in no fewer than three members). The Board will review the entire record and issue a decision in which it adopts, modifies, or rejects the factual findings and legal recommendations of the ALJ. 29 C.F.R. § 101.12(a). In doing so, the Board's longstanding policy is not to overrule an ALJ's credibility judgments unless "the clear preponderance of all the relevant evidence convinces" the panel that the determination is incorrect. *E.N. Bisso & Son, Inc. v. NLRB*, 84 F.3d 1443, 1444 (D.C. Cir. 1996); *Standard Dry Wall Products*, 91 N.L.R.B. 544 (1950). Any party aggrieved by the Board's final decision can seek review either in this court or in the United States Court of Appeals for the circuit where the unfair labor practice occurred or where the petitioning party resides or transacts business. 29 U.S.C. § 160(f); 29 C.F.R. § 101.14.

## Factual Background

This case arises from Inova's discipline or discharge of three nurses in the ambulatory surgery center of Inova's Fairfax, Virginia campus.

### *Donna Miller*

Donna Miller worked for Inova for nearly a quarter century prior to her discharge, including seven years in the ambulatory surgery center. There she rose to the level of Registered Nurse III. Colleagues described Miller as a "fabulous nurse," an "excellent clinician," "very efficient," and completely trustworthy.

In early 2009, Inova received three anonymous phone calls complaining about Miller. Although Miller did not have the authority to change anyone's schedule, the first caller accused Miller of vindictively changing the schedules of employees she did not like. The second caller said that Miller had used profanity in the operating room "for years," occasionally talked about sexual situations, and made others uncomfortable. The third caller accused Miller of intimidating coworkers, frequently using profanity, and taking extended lunch breaks. Following the third call in early February, Inova's human resources manager, Leanne Gorman, began investigating Miller, unbeknownst to Miller.

Around that same time, Miller and four other nurses discussed problems they were having with the hospital's nursing fellows program.[1] Specifically, the nurses were concerned that they were not being informed of the objectives for their nursing fellows to meet, were not asked for feedback on the fellows, and were in need of a one-week break between fellow rotations. The nurses agreed that Miller would send an email on their collective behalf to Paige Migliozzi, the head of the program, to convey those shared concerns.

On February 13th, Miller sent an email to Migliozzi and copied Paula Graling, the head of the ambulatory surgical center, spelling out the nurses' concerns with the fellows program. The email enraged Migliozzi. She sought out the nurses, demanded to know if Miller was the leader of their group, sent a copy of the email to human resources, and explained to human resources that she was "furious" that Miller "decided to appoint herself as spokesperson for this group." Deferred Appendix ("App.") 408. Graling also

---

[1] The nursing fellows program allows newly hired nurses, most of whom are recent graduates without operating room experience, to work with more senior nurses and obtain hands-on experience.

called human resources about the email, and sent a reply which chastised Miller and the nurses for sending a "group signed email which puts everyone on the defensive" rather than approaching her directly. *Id.* at 864.

Leanne Gorman and the human resources staff investigating Miller interviewed Migliozzi and eighteen additional employees, eight of whom were selected because they were known to have negative opinions about Miller. The eighteen interviewees were asked if they had seen any violation of Inova's policies or standards of behavior, if they had been made uncomfortable by other employees, or if they had witnessed inappropriate behavior in the workplace. Human resources, however, did not ask Migliozzi those standard questions, but instead specifically solicited information about her problems with Miller. Unsurprisingly, Migliozzi's comments were, by far, the most negative, complaining that Miller frequently talked about her intimate affairs, cursed, and did not properly count surgical instruments.

After speaking with Migliozzi about Miller's email, Gorman spoke with the Chief of Surgery, Dr. Russell Seneca, about her investigation of Miller. Gorman recorded in her notes that Dr. Seneca "fully support[ed]" Miller's termination. App. 425. Dr. Seneca instructed Gorman not to involve any doctors in her investigation because "they would not be happy about the decision" to terminate Miller. *Id.* Human resources closely involved Dr. Seneca in this personnel matter, and updated him constantly in the days leading to Miller's termination.

The next day, just two work days after Miller's February 13th email about problems with the nursing fellows program, Graling and Gorman informed Miller of the investigation and

placed her on administrative leave. Miller denied all but one allegation. She admitted that a doctor asked her what she did on New Year's Eve, and that she responded by saying she spent the evening naked in a hot tub with her husband. Miller denied that she used profanity or sexual innuendo any more than the doctors or other nurses, and explained that she did not try to be intimidating, but she was "definite about what [she] think[s]," which might have been perceived as intimidating by others. App. 425.

Miller also provided Gorman with a list of fourteen people she believed would attest to her professionalism, but Gorman refused to interview additional people on the ground that it "was not part of the investigation that [human resources] had chosen to go about." App. 127. Gorman then instructed Miller not to discuss her suspension with anyone other than her husband. Miller asked "are you telling me that I cannot discuss this with anyone else," and Gorman "said yes." App. 292.

Doctors Alexander Soutter and Allyson Askew, two surgeons who worked very closely with Miller, approached Gorman to provide statements on Miller's behalf, but Gorman refused the offers. Dr. Soutter then attempted to contact Gorman's supervisor, who did not return his calls. Dr. Askew asked the Senior Director of Nursing, Eileen Dobbing, if she could give a statement in support of Miller, but Dobbing refused to speak with her. Dr. Askew then attempted to speak with human resources and later with Graling, the head of the ambulatory surgery center, but she was rebuffed at every turn.

Finally, Doctors Soutter and Askew went to the Vice Chair of Surgery to discuss Miller's suspension. The doctors "were extremely supportive" of Miller, explaining that they considered her "an invaluable member of their team," and in

their daily work with her, they "had not seen any behavior in her which was objectionable." App. 583. The doctors disputed the complaints that Miller was intimidating, stating that she simply behaved "in a way a senior, mature nurse" would be to others learning. *Id.* at 582. The doctors added that Miller did not use profanity or sexual innuendo any more than other employees, and that some profanity and sexual innuendo was part of the ambulatory surgery center culture, a "'tone' [the doctors] set in the operating room." *Id.* at 583. The doctors concluded that they could not fathom why Miller was being punished, and offered to change their approach if it would rectify matters.[2]

Gorman and her supervisor, Julie Reitman, then discussed Miller with Inova's in-house counsel. Reitman subsequently drafted a memorandum recommending that Miller either be terminated or given a final written warning. Graling, Reitman, Gorman, and Dobbing presented that memorandum to the Chief Nursing Executive, Patricia Conway-Morana, during a meeting set up to discuss Miller's "intimidating behavior." App. 66–67. After the meeting, Conway-Morana sent an email to the Chief Executive Officer of Inova Fairfax, Dr. Reuven Pasternak. The email advised

---

[2] Extensive evidence from the hearing corroborated the doctors' views. *See, e.g.*, App. 188 (cursing in lounges, operating rooms, and hallways), 209–210 (obscene calendars hanging in operating rooms), 223 (a young nurse showing a topless photo of herself on vacation), 228 (employees discussing their intimate affairs), 255 (mooning in the locker room). As one nurse described: "The OR is a different place * * * a different culture," "[w]e do or say things that other people might not consider appropriate, and maybe my mother taught me not to do those things. But the area in which we work, it's not offensive[.] * * * It's just historically the way it's been since I've been there, since 1977. It's like being in a different country." *Id.* at 330.

Dr. Pasternak that Conway-Morana had an "employee issue" with a "20+ year nurse" who "had been warned in the past about her intimidating and inappropriate behavior," and who continued to be the object of complaints about "profanity, [being] vindictive about the schedule, [and] sexual innuendos." *Id.* at 430. Conway-Morana recommended termination. *Id.* The record does not explain why Conway-Morana contacted Dr. Pasternak, who had rarely, if ever, been involved in a personnel decision for any of Inova Fairfax's thousands of employees, other than the department chairs who report directly to him.

Dr. Pasternak responded the next morning, saying that he and Conway-Morana "need[ed] to talk about this case." App. 429. Following that conversation, Conway-Morana sent an email to the involved Inova personnel saying: "I think we need to move forward with termination." *Id.* Three work days later, Graling and Gorman told Miller that she was fired.

### *Judy Giordano*

Miller returned to Inova on March 18, 2009 to appeal her termination. That day, seven nurses went to human resources to express their support for Miller. When Miller and a human resources representative, Michelle Melito, walked through the hall, the nurses approached Melito, telling her that the hospital was "making a big mistake" because the nurses "love[d]" Miller. App. 628. Melito's notes indicate that "one staff member" "firmly pushed" her left shoulder to get her attention. *Id.*

When Melito complained, Inova investigated the incident. Six of the nurses present reported that they did not see anyone touch Melito. Inova nonetheless placed Giordano on administrative leave, explaining that, "[f]rom reviewing the surveillance video, it is apparent that you did touch the left

should[er] of" Melito, but that "[t]his touch was not done in an aggressive manner[.]" App. 633. Inova subsequently issued Giordano a final written warning that cited her for "inappropriate physical and verbal behavior." *Id.* at 631. That final warning removed all references to the incident as a "touch" that was "not done in an aggressive manner." *Id*.

### *Cathy Gamble*

In February 2009, Inova created new positions in the ambulatory surgery center for "clinical nurse leaders," and encouraged senior nurse specialists to apply. At that time, Inova had not decided how many clinical nurses it would hire. Five nurses, including Cathy Gamble, applied for the positions.

Gamble qualified for the promotion. She was a senior nurse specialist, had been a nurse for 29 years, and was the clinical expert for vascular and general surgery at the ambulatory surgery center. Her annual evaluations showed that she was an excellent nurse with superior clinical skills.

In June 2009, while her application was pending, Gamble and a colleague approached another nurse, Guna Perry, after she had volunteered to stay for an after-hours surgery. Gamble warned Perry that she was setting a bad precedent because management would come to expect ambulatory surgery center nurses to stay late to assist in surgeries that should have been scheduled for the main operating room.

Two months later, Inova promoted all of the applicants except Gamble to clinical nurse leader. When Gamble asked the management coordinator, Mary Lou Sanata, why she had not been promoted, Sanata cited her June discussion with Perry about not volunteering for after-hours surgeries.

**Procedural History**

In July 2009, the Fairfax Hospital's Nurses Association for Patient Safety filed unfair labor practice charges against Inova on behalf of Miller and Giordano. Cathy Gamble filed a separate charge concerning Inova's failure to promote her. The Regional Director subsequently filed a consolidated complaint covering all of the charges involving the three nurses. That complaint alleged that Inova committed unfair labor practices by (i) suspending and later terminating Donna Miller because she engaged in concerted activities by sending an email to management on behalf of herself and other nurses just two work days before she was suspended, (ii) instructing Miller not to discuss her suspension with anyone, (iii) suspending and then issuing a final written warning to Judy Giordano because of her protest against Miller's discharge, and (iv) failing to promote Gamble because she "concertedly told another employee not to accept unscheduled late surgeries because nurses would be expected to work late." App. 21.

### *Administrative Law Judge Decision*

After a fourteen-day hearing, the ALJ found that Inova committed all four of the unfair labor practices alleged in the complaint.

*First*, the judge found, as relevant here, that Miller engaged in protected activity on February 13, 2009, when she sent the email on behalf of a group of nurses seeking a week's hiatus between nursing fellows to improve the conditions of the nurses' work. The ALJ further found that Inova demonstrated animus toward that protected conduct when its high-level managers reacted to the February 13th email with extreme agitation and directed the nurses not to engage in such group complaints.

The ALJ also determined that Inova's alleged, non-discriminatory reasons for terminating Miller—her alleged use of profanity and sexual jokes—were post-hoc, pretextual rationalizations. The ALJ explained that Inova tolerated far more egregious conduct from other employees and that, in fact, the use of sexual jokes and profanity pervaded Inova's operating rooms.

The ALJ also found that the investigation against Miller "was not an impartial search for the truth; it was [an] effort to build a case against [her]," given that the investigators focused on individuals who already had grievances against Miller and refused to speak to her supporters. App. 30.

*Second*, the ALJ found that Inova had instructed Miller not to discuss her discipline with anyone but her husband, and that Inova lacked any legitimate justification for precluding such employee discussion, thereby interfering with Miller's right to engage in concerted activities.

*Third*, the ALJ found that, at the time Giordano came into physical contact with Melito, Giordano was engaged in a protected protest against Inova's unlawful termination of Miller, which entitled her to certain protections so long as she did not physically assault Melito. The ALJ concluded that, because the original disciplinary notice recognized that no shoving or pushing occurred, the severe discipline that Inova meted out for such minor contact was designed to intimidate other nurses from engaging in concerted activity.

*Fourth*, the ALJ found the failure to promote Gamble to be retaliatory because Inova conceded that an identified reason for the decision was Gamble's opposition, in concert with another nurse, to voluntary overtime. The ALJ found Inova's alternative explanations for not promoting Gamble to be non-credible, post-hoc, and pretextual rationalizations.

### *National Labor Relations Board Decision*

The Board affirmed the ALJ's rulings, findings, and conclusions. *Inova Health System v. NLRB*, 360 N.L.R.B. No. 135, at 1 (2014).[3] The Board rejected Inova's factual contention that it did not have knowledge of Miller's protected activity, ruling that Inova's "high-level managers, including HR Manager Gorman and Chief of Surgery Dr. Seneca, were aware of the concerted nature of Miller's conduct when they shared and discussed Miller's email," and the timing of Miller's suspension "strongly suggests that animus toward the email played a role in the decision." *Id.* at 5. The Board also found that Inova failed to show that it would have suspended and discharged Miller in the absence of that protected activity, given that the cited reason—the allegedly inappropriate conduct—was an established "part of the culture of [Inova's] operating rooms," which Inova "tolerated" when committed "by others[.]" *Id.* at 6.

With respect to the gag order on Miller's discussion of her suspension, the Board found that Inova's argument that it only "recommended" that Miller keep silent was flatly contradicted by the record evidence. *Inova*, 360 N.L.R.B. No. 135, at 6–7.

On the question of Judy Giordano's discipline, the Board rejected Inova's argument that Giordano lost all protection under the Act because of her contact with Melito. The Board held that, even if Giordano had touched Melito's shoulder, that was not the type of serious physical conduct that would strip an employee of the Act's protections. *Inova*, 360 N.L.R.B. No. 135, at 7.

---

[3] In doing so, the Board said that it was adopting the ALJ's factual findings without "rely[ing] on his numerous inferences[.]" *Inova*, 360 N.L.R.B. No. 135, at 1 n.2.

Finally, the Board agreed that Inova had improperly failed to promote Gamble. The Board held that Gamble's comments to Perry were protected, finding that Inova's claim that Gamble encouraged an unprotected strike misunderstood the law because a refusal to perform *voluntary* work is not a strike. *Inova*, 360 N.L.R.B. No. 135, at 8. The Board further determined that Inova's asserted non-discriminatory reasons for its denial of promotion were post-hoc rationalizations that were "unsupported by the record, and in one instance, simply untrue." *Id.* at 9.

The Board then ordered Inova to take certain remedial steps, including: (i) to offer Miller full reinstatement to her former, or a substantially equivalent, position; (ii) to offer Gamble the position of clinical nurse leader; (iii) to remove all reference to the unlawful discipline of Miller and Giordano from its files; and (iv) to make Miller and Gamble whole for any losses suffered as a result of the discrimination against them. *Inova*, 360 N.L.R.B. No. 135, at 10.

## II

## Analysis

Our review of the Board's unfair labor practice determinations is tightly cabined and we afford the Board a "high degree of deference." *Parsippany*, 99 F.3d at 419; *see also Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1061 (D.C. Cir. 2001) ("Judicial review of NLRB unfair labor practice findings is limited."). We will uphold a decision of the Board "unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012). The Board's findings of fact are "conclusive when

supported by substantial evidence on the record considered as a whole," and "[i]ndeed, the Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (internal quotation marks omitted). "'We are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial.'" *Traction Wholesale Center Co., Inc. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000) (quoting *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000)). Finally, we accept all credibility determinations made by the ALJ and adopted by the Board unless those determinations are "patently insupportable." *Id.* (internal quotation marks omitted); *Douglas Foods*, 251 F.3d at 1061.

### *Suspension and Termination of Donna Miller*

In determining whether an employer's discipline of an employee constituted an unfair labor practice, the Board applies the *Wright Line* test. *See generally Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980); *see also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 395 (1983) (approving *Wright Line* test); *Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 652 (D.C. Cir. 1994). To make out a *prima facie* case under *Wright Line*, the General Counsel for the Board must demonstrate that (i) the employee was engaged in an activity protected by 29 U.S.C. § 157, (ii) the employer was aware of that protected activity, and (iii) "the protected activity was a motivating factor in the employer's decision to take adverse action[.]" *Citizens Inv. Services*, 430 F.3d at 1198. Oftentimes the General Counsel can show that the protected activity was a motivating factor by evidencing "a reasonable proximity in time between the adverse action in question and the employer's knowledge of, and hostility

toward, the employee's protected activity." *G.B. Electric, Inc.*, 319 N.L.R.B. 653, 658 (1995). Once the General Counsel has made that *prima facie* showing, the burden of persuasion shifts to the employer "to show that it would have taken the same action in the absence of the unlawful motive." *Bally's Park Place*, 646 F.3d at 935 (internal quotation marks omitted).

Inova does not dispute that the Board applied the correct legal standards under *Wright Line*. Inova just challenges the substantiality of the evidence supporting the Board's application of that test to this record. That is a hard hill to climb. "Substantial evidence," after all, is "less than a preponderance of the evidence," albeit "more than a scintilla." *Multimax Inc. v. FAA*, 231 F.3d 882, 887 (D.C. Cir. 2000) (internal quotation marks omitted). The question before the court thus "is not whether" Inova's "view of the facts supports its version of what happened, but rather whether the" Board's "interpretation of the facts is reasonably defensible." *Dean Transportation, Inc. v. NLRB*, 551 F.3d 1055, 1061 (D.C. Cir. 2009) (internal quotation marks omitted). Asking the latter question, we hold that substantial evidence supports the Board's decision.

*First*, the Board properly concluded that Miller was engaged in protected conduct when she sent the February 13th email raising concerns, on behalf of a group of nurses, about their work with the nursing fellows program. The Board found, and Inova does not dispute, that the email constituted "concerted activity" within the meaning of 29 U.S.C. § 157, because it was "undertaken with or on the authority of other employees[.]" *Citizens Inv. Services*, 430 F.3d at 1198.

The Board also reasonably concluded that the email addressed a matter relevant to "mutual aid or protection," 29

U.S.C. § 157. The email spoke about the nurses' collective need for a transitional break between each round of nursing fellows and the difficulties the nurses were confronting in integrating the fellows into their daily work activities. In so doing, the email directly addressed an aspect of the nurses' own working conditions and gave voice to "legitimate employee concerns about employment-related matters." *Tradesman Int'l*, 275 F.3d at 1141 (internal quotation marks omitted); *see also American Golf Corp.*, 330 N.L.R.B. 1238, 1244 (2000) (employees' protest letter complaining of short workweeks during winter rainy season was protected).

Inova's argument that the email pertained only to the quality of the fellows program ignores the communication's request for transition time for the nurses. There is a clear "nexus" between, for example, the request for recovery time between rounds of supervising new fellows and the nurses' "interests as employees." *Venetian Casino Resort*, 484 F.3d at 606–607; *Tradesmen Int'l*, 275 F.3d at 1141. That issue directly impacted the nurses' own week-to-week working conditions because it determined how much time the nurses had to prepare for new fellows and the efficient integration of the fellows into the nurses' daily work. *See Inova*, 360 N.L.R.B. No. 135, at 3 (the nurses' concerns needed to be addressed "[i]n order to be better prepared" and work through the program "in a timely fashion"). The Board further found that Miller's email "initiate[d] a discussion about how certain aspects of [Inova's] fellows program affected [the surgical center] nurses" and their working conditions. *Id.* at 5. For those reasons, the email communication's connection to the nurses' working conditions was specific and direct; it certainly was not "so attenuated that [it] cannot fairly be deemed to come within the 'mutual aid or protection' clause." *Venetian Casino*, 484 F.3d at 608 (quoting *Eastex*, 437 U.S. at 568) (alteration in original).

*Second*, there is no dispute that Miller's supervisors were aware of the communication. The email was sent to both Migliozzi and Graling, the head of the ambulatory surgery center, and was shared or discussed with others, including human resources manager Gorman. Substantial evidence also supports the Board's finding that the email went further up the chain of command. Gorman spoke with Dr. Seneca about her investigation the very first work day after she received Migliozzi's complaint about the February 13th email, and she kept Dr. Seneca updated throughout the process. Although Gorman denies mentioning the February 13th email, the ALJ "discredit[ed] this denial" because "it defies credulity to believe that Gorman talked to Dr. Seneca on the very first work day after she received another complaint from Migliozzi about Miller and did not mention it." *Inova*, 360 N.L.R.B. No. 135, at 18. As this credibility finding is not "patently insupportable," we are bound by it. *Traction Wholesale*, 216 F.3d at 99. Thus, circumstantial, but substantial, evidence supports the Board's finding that Gorman and Dr. Seneca "shared and discussed Miller's email." *See Inova*, 360 N.L.R.B. No. 135, at 5 (finding that Inova's "high-level managers, including HR Manager Gorman and Chief of Surgery Dr. Seneca" "shared and discussed Miller's email").

*Third*, substantial evidence supports the Board's factual determination that supervisory animus over that protected communication was a motivating factor in Miller's discharge. It is not even a close question. Migliozzi's animus was undisguised. Her own email to Gorman said she was "quite furious" that Miller was acting as "spokesperson for this group" and that the nurses were "ganging up" on her. *Inova*, 360 N.L.R.B. No. 135, at 3, 18. Graling then emailed Miller and the other nurses criticizing their use of a "one dimensional group signed email [that] puts everyone on the

defensive," rather than "each" nurse coming to a supervisor directly. *Id*. at 4, 6, 18.[4]

That Miller's discharge came close on the heels of the protected email further substantiates the Board's decision. The Board and this court have long recognized that the close proximity of protected conduct, expressions of animus, and disciplinary action can support an inference of improper motivation. *See, e.g.*, *Citizens Inv. Services*, 430 F.3d at 1202 ("The timing of [the employee's] discharge," which was "two

---

[4] Inova nowhere suggests—nor could it—that any aspect of the email's content was incendiary, unprofessionally communicated, or lacking in proper tone. The email said:

> We are [writing] regarding the coordination of the fellows and follow up evaluations for each service. We haven't received any packets with the objectives/evaluations for each fellow as they rotate through our service in quite a while. In order to be better prepared for a comprehensive rotation in each service, it would be helpful to know who is coming, the learning objectives and the length of the rotation. We need a tool to evaluate the fellows and a way to document their progress in a timely fashion. We have not been asked for any feedback on the fellows on their progress and we feel that is an important piece of the fellowship program that we need to pay attention to. I know in [pediatrics] that we need a break for a week before we have another fellow. The surgeons need it and we do too. Can you provide some assistance or guidance to us to help us with ou[r] concerns? We are committed to giving these fellows the best possible educational experience with all of our combined experience and guidance!

App. 32.

weeks after he had identified himself as 'union president' in an email" to his supervisor, "also supports the Board's finding of unlawful motive."); *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1283 (D.C. Cir. 1999) ("[T]iming is a telling consideration in determining whether employer action is motivated by anti-union animus."); *Masland Industries*, 311 N.L.R.B. 184, 197 (1993) ("'Timing alone may suggest anti-union animus as a motivating factor in an employer's action[.]'") (quoting *NLRB v. Rain-Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir. 1984)).

In this case, those events could hardly be more proximate. After receiving Miller's email, Migliozzi fled work "because I am quite furious" and asked Gorman if they could discuss the email the next work day. *Inova*, 360 N.L.R.B. No. 135, at 18. After Migliozzi and Gorman discussed the matter, Gorman raised the subject of the email and Migliozzi's heated reaction at a managers' meeting and with the Chief of Surgery, Dr. Seneca. The very next day, Miller was suspended. Substantial evidence thus supported the Board's finding of improper motivation.[5]

Inova argues that all that causal evidence is for naught because the final decision to discharge was made by the Chief Executive Officer of the Fairfax campus, Dr. Pasternak, and there is no evidence that he personally was motivated by the email. That argument blinks reality. The "high-level

---

[5] In its order, the Board also discussed an incident in 2005 when Miller was disciplined for "insubordination" after questioning her supervisor about scheduling after-hours surgeries. Inova argues that, because of the Board's six-month statute of limitations, 29 U.S.C. § 160(b), the Board could not consider that incident. Because the record contains substantial evidence of an unfair labor practice even without reference to the 2005 incident, we need not address Inova's objection.

managers" who knew about the email and were upset by it were the same managers who (i) took the unsatisfactorily explained step of involving Dr. Pasternak in an individual nursing personnel decision that he self-admittedly had "rarely" been involved in before, App. 387, and indeed, Inova identified no other instance of his involvement in the discipline or discharge of a rank and file employee, (ii) selectively controlled all of the information fed to Dr. Pasternak, including that on which the termination decision was made, (iii) deliberately obstructed the efforts of Miller's supporters to weigh in, and (iv) proposed termination as an appropriate remedy to Dr. Pasternak. *Inova*, 360 N.L.R.B. No. 135, at 4, 24–25. In fact, those high-level managers' investigation and recommendation formed the sole basis for Dr. Pasternak's ultimate decision.

It thus was "eminently reasonable" for the Board to rely on the critical causal role played by those "high-level corporate managers," *Parsippany*, 99 F.3d at 423, because Pasternak's decision—indeed, the fact that Pasternak was involved at all—was directly set in motion and driven by those managers' animus-motivated conduct. *See Inova*, 360 N.L.R.B. No. 135, at 4–5; *see also United States v. Staub*, 562 U.S. 411, 416–422 (2011); *Griffin v. Washington Convention Center*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."); *cf. Ross Stores, Inc. v. NLRB*, 235 F.3d 669, 673–674 & n.7 (D.C. Cir. 2001) (recognizing that it would have been "eminently reasonable" to impute animus to the company from a "high-level" manager, but holding that anti-union statements of a supervisor did not prove the company's animus because there was not "any evidence that [the supervisor] was involved in [the employee's] discharge"). In short, the Board reasonably found Inova responsible for an

unfair labor practice because Inova's high-level managers used the authority that Inova gave them to take measures based on discriminatory animus that caused and were intended to cause the dominoes to fall exactly as they did.

Inova contends that *Flagstaff Medical Center, Inc. v. NLRB*, 715 F.3d 928 (D.C. Cir. 2013); *Detroit Newspaper Agency v. NLRB*, 435 F.3d 302 (D.C. Cir. 2006); and *Meco Corp. v. NLRB*, 986 F.2d 1434 (D.C. Cir. 1993), require a finding that the final decisionmaker must independently have knowledge of and animus toward the protected activity. That argument misunderstands those cases. They stand for the much narrower proposition that the Board must actually prove that a *low-level* supervisor had animus, and that the low-level supervisor played some material role in the eventual discharge. *See Flagstaff Medical Center*, 715 F.3d at 935–936 (vice-president who made termination decision did not know about the employee's union activities, and Board failed to prove that the supervisor who recommended termination acted with animus at all, as he had a consistent record of enforcing the company's attendance policy); *Detroit Newspaper*, 435 F.3d at 310 (knowledge and animus could not be imputed to the company when the only evidence of any animus was an allegation that a low-level supervisor, who "was not directly involved in the final decision to terminate," might have made an anti-union statement during a strike several years before); *MECO Corp.*, 986 F.2d at 1437 (anti-union comments of two low-level factory supervisors failed to establish a motivating factor because "neither supervisor * * * had anything to do with [the] discharge").

This case is very different. The record supported the Board's judgment that Inova's high-level supervisors had knowledge of Miller's protected activity, displayed animus toward that activity, and were directly and intimately involved

in conducting a biased investigation that produced a biased recommendation that caused her termination.

*Fourth*, the Board reasonably concluded that Inova failed to prove that it would have fired Miller even in the absence of her protected conduct. Inova pointed to a handful of complaints that this 22-year veteran nurse had been vindictive and vulgar. The Board found that explanation to be pretextual, and substantial evidence backed that judgment up.

To begin with, Inova failed to explain why, if Miller's behavior was legitimately at issue, it conducted such a one-sided investigation into the isolated complaints about her behavior, literally closing the door on doctors' and others' efforts to attest to Miller's professionalism and skill.

Inova stresses that it began the investigation before Miller's protected email. True enough. But it fails to explain why that investigation came to a screeching halt immediately after Migliozzi complained to Gorman about the protected email communication. Also missing from Inova's explanation is why Dr. Seneca, after the email had been sent, warned human resources not to speak to any doctors, why Inova went to such lengths to exclude any favorable information, and why human resources staff felt a need to have Dr. Pasternak pull the trigger given that he had "rarely" if ever, been involved in the hiring or firing of any hospital staff. App. 387. Thus, whatever the investigation's genesis, it was the abrupt and abnormal conclusion of that skewed investigation in the immediate wake of Miller's protected conduct that the Board found telling.

Inova argues that whether Miller actually engaged in misconduct is beside the point, as long as it had a "reasonable belief" that Miller had done so. That shortchanges Inova's burden of proof. It had to show not only that it reasonably

believed Miller had engaged in vulgar and intimidating behavior, but that the nature of that behavior "would have" caused her suspension and termination regardless of her protected conduct. *DTR Industries, Inc.*, 350 N.L.R.B. 1132, 1135 (2007), *enforced*, 297 F. App'x 487 (6th Cir. 2008).

That is where Inova's proof came up short. The record amply supports the Board's skepticism that Inova suddenly started enforcing a zero-tolerance policy for vulgarity or vindictiveness. The only evidence of that purported policy was Dr. Pasternak's reply to Conway-Morana, in which he explained that he was instituting such a policy against *physicians*, not nurses, and Dr. Pasternak's testimony, which the ALJ and Board both found was not credible. Inova makes no showing that the credibility determination was "patently insupportable," and so we must credit it. *Traction Wholesale*, 216 F.3d at 99.

In addition, Dr. Soutter testified that he had never heard of Inova's so-called "citizenship" policy, let alone a shift to zero tolerance, until after Miller's termination. App. 231. Nor did Inova introduce any evidence that any other employee—before or since—has been terminated on similarly scant evidence. Quite the opposite, the record is replete with evidence that practical jokes, sexual innuendo, and obscenity were prevalent in Inova's operating rooms and offices during that same time period, with at least one of the supervisors who orchestrated Miller's termination joining in. App. 211 ("Dr. Seneca could cuss like a sailor.").

Moreover, employees who engaged in far more egregious behavior received a far more calibrated response. For example, employees who physically assaulted and made racial threats to a coworker, insulted and humiliated a coworker during a meeting, threatened to cut someone's throat during

an altercation, and showed topless photos of themselves to staff were all afforded written warnings and an opportunity to correct their behavior before termination. Thus, far from helping Inova, the record of selective and disproportionate punishment of Miller corroborates the Board's finding of pretext. *See, e.g.*, *Bally's Park Place*, 646 F.3d at 936–939 (the Board reasonably concluded that employer failed to meet its rebuttal burden when it enforced a policy with "zero-tolerance" against the discharged employee, but not others); *NLRB v. ADCO Electric, Inc.*, 6 F.3d 1110, 1119 (5th Cir. 1993) (employer failed to meet rebuttal burden when it claimed to have discharged an employee for failing to work overtime, but did not do so for non-union supporting employees).

For those reasons, the Board reasonably determined that Miller's discharge constituted an unfair labor practice.

### *Warning Miller Not to Discuss Suspension*

Inova separately challenges the Board's determination that it committed an unfair labor practice by directing Miller not to discuss her suspension with anyone else. Inova, however, does not dispute—nor could it—settled Board precedent holding that employees have a protected right to discuss discipline or disciplinary investigations with fellow employees. *See, e.g.*, *Cast-Matic Corp.*, 350 N.L.R.B. 1349, 1355 (2007) ("Absent a total ban on employee discussion about any topic during work, employees have a right to discuss discipline with fellow employees."); *see also Cintas Corp. v. NLRB*, 482 F.3d 463, 468 (D.C. Cir. 2007) (The NLRA protects "an employee's right to discuss the terms and conditions of her employment with other employees and with nonemployees[.]") (internal citations omitted). An employer may prohibit such discussion only when a "substantial and

legitimate business justification" outweighs the "infringement on employees' rights." *Caesar's Palace*, 336 N.L.R.B. 271, 272 (2001); *see also Phoenix Transit System v. NLRB*, 63 F. App'x 524, 525 (D.C. Cir. 2003) (per curiam) ("Employees' right to discuss the terms and conditions of their employment may legitimately be restricted only if their interests are outweighed by an employer's valid confidentiality interest.").

Instead, Inova fights the record evidence, insisting that it only "recommended" that Miller keep the investigation confidential and did not threaten Miller with discipline. The short answer is that the Board fairly read the record to say otherwise. Miller testified that, after Gorman advised her to keep mum about her suspension, Miller specifically asked "are you telling me that I cannot discuss this with anyone else," and Gorman "said yes." App. 292. In addition, an email exchange indicates that Miller's husband was "counseled" for discussing his wife's suspension. App. 867.

Finally, in its reply brief, Inova cursorily suggests that protecting employees' right to discuss discipline is inconsistent with the official guidance of the federal Equal Employment Opportunity Commission. We need not consider this argument because Inova's fleeting reference to the point, in its reply brief no less, cannot save it from appellate forfeiture. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

### *Discipline of Judy Giordano*

Inova challenges the Board's determination that it committed an unfair labor practice when it disciplined Judy Giordano for her physical encounter with a human resources employee, Michelle Melito, while protesting Miller's discharge. Inova argues that (i) Giordano lost the protection

of the National Labor Relations Act by intentionally touching Melito during the protest, and (ii) Inova's reasonable belief in Melito's version of events justified disciplining Giordano.

As an initial matter, Inova does not dispute that Giordano's conduct arose in the context of a protected activity—a group protest against Miller's discharge. Inova's arguments instead come down to a quarrel with the Board's reading of the record, which cannot survive our deferential review.

The Board has long held that an employer commits an unfair labor practice if it disciplines an employee for engaging in a lawful protest or concerted activity, unless the employee engages in "opprobrious conduct" in the course of otherwise protected activity. *See Atlantic Steel Co.*, 245 N.L.R.B. 814, 816 (1979). In assessing whether the employee's conduct crosses that "opprobrious" threshold, the Board balances four factors: (i) the place of the discussion, (ii) the subject matter of the discussion, (iii) the nature of the employee's outburst, and (iv) whether the outburst was, in any way, provoked by the employer's unfair labor practices. *Id.* Inova does not dispute that *Atlantic Steel* governs this case. *See* Inova Br. 47–48 (relying on cases applying the *Atlantic Steel* framework); Reply Br. 21–22 (same).

In applying that test, court and Board precedent have long recognized that it must be applied with an understanding that labor relations often involve heated disputes "likely to engender ill feelings and strong responses." *Kiewitt Power Constructors*, 355 N.L.R.B. 708, 711 (2010), *enforced*, 652 F.3d 22 (D.C. Cir. 2011) (internal quotation marks omitted). Accordingly, an employee's right to engage in concerted activity "'permit[s] some leeway for impulsive behavior.'" *Kiewitt Power Constructors Co. v. NLRB*, 652 F.3d 22, 27–28

(D.C. Cir. 2011) (quoting *NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 207 (7th Cir. 1971)).

The record supports the Board's conclusion, in applying those factors, that Giordano's physical contact with Melito did not sink to such a low level as to strip Giordano of the Act's protection. As an initial matter, the interchange with Melito occurred in a non-work area, a hallway in front of the human resource offices, where no patients or members of the public could have been disturbed. *Cf. NLRB v. Starbucks Corp.*, 679 F.3d 70, 79 (2d Cir. 2012) (noting "the entirely legitimate concern of an employer not to tolerate employee outbursts * * * in the presence of customers").

More importantly, any physical contact was mild. It is not even clear from the surveillance tapes that Giordano touched Melito; six of the seven nurses denied it happened at all. Inova's claim that Giordano "pushed" Melito, Inova Br. 48, thus is a quite generous reading of the record that contradicted Inova's own initial disciplinary form, which described the incident as a "touch" that "was not done in an aggressive manner," *Inova*, 360 N.L.R.B. No. 135, at 7 n.17, 26; *see also* App. 628 (Melito's contemporaneous notes describe the incident "seemingly as a gesture to turn me around"). Hardly opprobrious.

### *Failure to Promote Cathy Gamble*

Inova's final challenge is to the Board's determination that it committed an unfair labor practice by refusing to promote Cathy Gamble because she engaged in protected concerted activity. The Board applies a modified version of the *Wright Line* test to allegations that an employer failed to promote an employee in retaliation for the employee's protected activities. *See W&M Properties of Connecticut, Inc. v. NLRB*, 514 F.3d 1341, 1347 (D.C. Cir. 2008). The

burden shifting framework remains the same, but the *prima facie* case has two additional components: the Board must find that (i) the employer was hiring, and (ii) the unhired applicant had relevant experience or training for the job. *Id.* (citing *FES (A Division of Thermo Power)*, 331 N.L.R.B. 9, 12–13 (2000), *enforced*, 301 F.3d 83 (3d Cir. 2002)).

The record supports the Board's finding of a *prima facie* case of retaliatory failure to promote. First, it is uncontroverted that Inova was hiring, and that Gamble had the requisite experience and qualifications for the "clinical nurse leader" position. Second, the Board reasonably found that Gamble engaged in protected activity when she and another nurse advised Guna Perry against volunteering for after-hours surgeries, and the relevant decisionmakers knew about that prior to the denial of her promotion. Third, Inova does not argue that Gamble's statements to Perry were not a form of concerted activity. Fourth, the causal relationship is undisputed. When Gamble was the only qualified applicant denied promotion to clinical nurse specialist, the management coordinator, Mary Lou Santana, specifically cited Gamble's comments to Nurse Perry as evidencing a lack of leadership, adding "that wasn't a good thing to say to your peer[.]" App. 197–198.

Inova does not dispute that Gamble's discussion with Perry was a motivating factor in its promotion decision or any of the other elements of the *prima facie* case. Instead, Inova argues that Gamble's comments to Perry constituted advocating for a partial strike, which under *Audubon Health Care Center*, 268 N.L.R.B. 135, 136 (1983), is not a protected activity.

That is incorrect. Employees engage in a partial strike when they refuse to work on "certain assigned tasks while

accepting pay or while remaining on the employer's premises." *Audubon Health Care Center*, 268 N.L.R.B. at 136. The refusal to perform voluntary work—non-mandatory work that is "not a condition of employment" and that the employee has a "right to decline to perform"—is not an unprotected strike. *St. Barnabas Hospital*, 334 N.L.R.B. 1000, 1000 (2001), *enforced*, 46 F. App'x 32 (2d Cir. 2002). Perry testified that she had "volunteered" to perform the late surgery, and that she could have declined and gone home. App. 320. The Board thus reasonably concluded that Gamble's discouragement of such volunteerism could not have amounted to advocating a strike.

Inova also argues that it had legitimate reasons for not promoting Gamble. But substantial evidence supports the Board's conclusion that Inova's "stated reasons for failing to promote Gamble [were] largely unsupported by the record and, in one instance, simply untrue." *Inova*, 360 N.L.R.B. No. 135, at 8. For example, Inova argued that its matrix of factors indicated that Gamble was a middle to low performer. But Gamble had received above-average scores on most of her evaluations. In addition, management wrote "prone to gossip" on Gamble's paperwork, but the management coordinator who played an instrumental role in Gamble's evaluation had no idea what that comment referred to. App. 198–199.

Lastly, Inova argues that the Board impermissibly substituted its judgment for that of the employer by rejecting Inova's stated reasons. But once a *prima facie* case was made out, the burden was on Inova to persuade the Board that those alternative reasons were the basis for its decision. Given the management coordinator's open admission that protected conduct influenced the decision and the evidentiary weaknesses in the alternative explanations proffered by Inova,

this court cannot say that the Board's decision was unreasonable or unsupported by the record.

## III

## Conclusion

We hold that the Board's unfair labor practice determinations were reasonable, consistent with the law, and supported by substantial evidence. We accordingly deny Inova's petition to review the Board's order and grant the Board's cross-application for enforcement.

*So ordered.*