# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 4, 2022            Decided August 9, 2022

No. 21-1191

CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL, AND
SERVICE WORKERS INTERNATIONAL UNION, LOCAL 5668,
INTERVENOR

———

Consolidated with 21-1194

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the National Labor Relations
Board

———

*Michael E. Kenneally* argued the cause for petitioner. With him on the brief was *David R. Broderdorf*.

*Joel A. Heller*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Jennifer A.*

*Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, *Julie Brock Broido*, Supervisory Attorney, and *Jared D. Cantor*, Senior Attorney.

*Nathan Kilbert* argued the cause and filed the brief for intervenor in support of respondent.

Before: HENDERSON and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

WILKINS, *Circuit Judge.* In 2018, the National Labor Relations Board ("NLRB" or "Board") decided that Constellium Rolled Products had violated Sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (3), by suspending and terminating employee Andrew "Jack" Williams for offensive conduct done in the course of protected Section 7 activity, 29 U.S.C. § 157. *See Constellium Rolled Products Ravenswood, LLC*, 366 NLRB No. 131 (July 24, 2018). On review, this Court held that the Board had based its decision "upon substantial evidence" without "impermissibly depart[ing] from precedent without explanation," but had failed to address the potential conflict between its interpretation of the NLRA and Constellium's obligations under state and federal equal employment opportunity laws. Accordingly, the Court issued a remand. *Constellium Rolled Products Ravenswood, LLC v. NLRB* ("*Constellium I*"), 945 F.3d 546, 548–49 (D.C. Cir. 2019), *judgment entered*, 790 F. App'x 219 (D.C. Cir. 2019) (per curiam).

On remand, the Board affirmed its earlier decision, but used a different analytical framework to do so. *Compare Constellium Rolled Products Ravenswood, LLC*, 371 NLRB No. 16 (Aug. 25, 2021) (using the framework from *Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds sub nom. NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), as announced in *General Motors LLC*, 369 NLRB No. 127 (July 21, 2020)), *with Constellium Rolled Products Ravenswood, LLC*, 366 NLRB No. 131 (July 24, 2018) (using the *Atlantic Steel Co*., 245 NLRB 814 (1979), and "totality-of-the-circumstances" frameworks). Constellium argues that the Board has failed to reconcile the conflict upon which we remanded the case and challenges the Board's most recent analysis. We conclude that the Board sufficiently addressed the conflict between the NLRA and Constellium's antidiscrimination obligations and reasonably found that Constellium terminated Williams in violation of Sections 8(a)(1) and (3) of the NLRA. 29 U.S.C. § 158(a)(1), (3). We deny Constellium's petition and grant the Board's cross-application for enforcement of its order.

I.

In 2013, Constellium unilaterally changed the system for scheduling overtime assignments at its facility in Ravenswood, West Virginia. Under the new system, employees interested in working overtime were required to write their name on sign-up sheets posted in a high traffic area—outside of the lunchroom and near a timeclock. The system required employees to sign-up for open slots a week in advance and failure to complete the shift after signing up resulted in discipline. J.A. 13, 50.

The change prompted immediate protest among some of the facility's unionized workers. Those employees preferred

the overtime procedure articulated in a since-expired collective bargaining agreement under which Constellium solicited individual employees in-person or over the phone. Significantly, in that prior system, employees who failed to work after volunteering were not disciplined. Intervenor Br. 4. In response to the change, the Union filed an unfair labor practice charge with the NLRB. 50 employees filed grievances. And some employees—including Williams—boycotted the new procedures by refusing to sign up for overtime, J.A. 13, 159–223, actions that forced Constellium to assign mandatory overtime, change work schedules to meet production needs, and use outside contractors. Pet'r Opening Br. 13. One further act of protest used to evidence certain employees' disdain for the change: the common use of the term "whore board" to describe the overtime sign-up sheet. J.A. 13, 47, 51, 58, 107. *But see id*. at 67.

Constellium regularly tolerated the use of the offensive term. *Id*. at 48, 51. That changed, however, when Williams wrote "whore board" at the top of two sign-up sheets six months after the implementation of the new procedure. *Id*. at 14, 232.

Amidst Constellium's investigation into the writing's origins, Williams admitted to the act. In response, Constellium suspended Williams and ultimately terminated his employment. *Id.* at 14.

An NLRB Administrative Law Judge acknowledged that Williams's conduct was an expression of concern about a

condition of employment but concluded that it was an unprotected act of vandalism that did not occur in the course of protected activity. *Constellium Rolled Products Ravenswood, LLC & United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, Loc. 5668*, No. 09-CA-116410, 2016 WL 5591055 (Sept. 29, 2016); J.A. 25, 27–28. The Board's General Counsel filed exceptions to the ALJ's decision, and upon review, the Board overturned the ALJ's recommendations. *Constellium I*, 945 F.3d at 549. In its view, "in writing 'whore board,' Williams was engaged in a continuing course of protected activity . . . and did not lose the Act's protection." 366 NLRB No. 131, at *1.

In review of the Board's conclusion, we held that the Board had "not depart[ed] from its own precedent without explanation and . . . did not create any new, unequivocal rights of employees to deface company property" by holding that Williams's conduct was done in the course of protected Section 7 activity. *Constellium I*, 945 F.3d at 550. Additionally, we held that the Board's conclusion was based upon its finding that "Constellium 'disciplined Williams for the protected content of his writing,' rather than for defacing Company property," a finding supported by substantial evidence in the record. *Id*. at 550 (quoting 366 NLRB No. 131, at *2 n.8). Notwithstanding our rejection of Constellium's challenges to the Board's conclusion, we remanded the matter back to the NLRB to address the potential conflict between the NLRA and Constellium's obligations to maintain a harassment-free workplace. *Id*. at 551–52.

Relatedly, before addressing our concern on remand, the Board announced a shift in its approach to deciding whether employers have unlawfully disciplined employees who have engaged in abusive conduct in connection with protected Section 7 activity. In *General Motors LLC*, 369 NLRB No.

127 (July 21, 2020), the Board declared that going forward, it would employ the *Wright Line* framework, instead of several others, including the two standards used by the Board to conclude that Constellium had violated Sections 8(a)(1) and (3). *Id.* at *1–2 ("In some instances, violations found under these standards have conflicted alarmingly with employers' obligations under federal, state, and local antidiscrimination laws. . . . [B]y using these standards to penalize employers for declining to tolerate abusive and potentially illegal conduct in the workplace, the Board has strayed from its statutory mission."); *see Wright Line*, 251 NLRB 1083 (1980), *enforced sub nom. NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982), *approved* in *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983). The Board observed that the *Wright Line* framework allowed employers to demonstrate that a disciplinary action was taken in service of its obligations under antidiscrimination laws separate and apart from, and thus not responsive to, any protected Section 7 activity. *Gen. Motors LLC*, 369 NLRB No. 127, at *2.

Under the *Wright Line* framework, the General Counsel must show that "(1) the employee engaged in Section 7 activity, (2) the employer knew of that activity, and (3) the employer had animus against the Section 7 activity, which must be proven with evidence sufficient to establish a causal relationship between the discipline and the Section 7 activity." *Id.* If the General Counsel is successful, then the employer has an opportunity to persuade the Board that it would have taken the same action in response to the abusive conduct even in the absence of the Section 7 activity. *Id.* Thus, an employer "avoid[s] an unfair labor practice finding by showing by a preponderance of evidence that the worker would have [faced an adverse employment action] even if he had not been involved with the union." *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1010 (D.C. Cir. 2022) (internal quotation marks and

citation omitted) (alteration in original).  Under this analytical approach, the Board affirmed its earlier decision.  *See Constellium*, 371 NLRB No. 16, at *1.

The Board found that the General Counsel had made its *prima facie* showing.  It found "no dispute under the law of the case that Williams engaged in protected Section 7 activity when he wrote 'whore board'" because in its earlier decision, the Board found that Williams's offensive act was "part of a continuing course of protected activity" in protest of the overtime procedures, and that Constellium disciplined Williams for the content of his writing. *Id*. at *3.  The Board accurately points out that these findings were undisturbed by *Constellium I*.  *Id*.; *see Constellium I*, 945 F.3d at 548 ("The Board's decision was based upon substantial evidence and did not impermissibly depart from precedent without explanation.").  Similarly, the Board found no dispute about whether Constellium knew of the Section 7 activity; it did.  Finally, the Board concluded that Constellium had animus against Williams's Section 7 activity.  It relied on "[c]ircumstantial evidence of disparate treatment of the discriminatee," *id.* at *4, namely, record evidence that Constellium failed to discipline or censor the use of the epithet "whore," and "tolerated extensive profanity, vulgarity, and graffiti in the workplace" before disciplining Williams, *id.* at *5. *See Wendt Corp.*, 369 NLRB No. 135 (July 29, 2020) ("[C]ircumstantial evidence of animus under *Tschiggfrie Properties* is clearly established by the [company's] disparate treatment of [an employee].") (referencing *Tschiggfrie Props., Ltd.*, 368 NLRB No. 120 (Nov. 22, 2019)).

Moving to *Wright Line* step two, Constellium could not persuade the Board that it would have disciplined Williams for writing "whore board" on the sign-up sheets absent his protected Section 7 activity for much the same reasons.

*Constellium*, 371 NLRB No. 16, at *5 ("[Constellium] permitted the common use of the term 'whore board,'" and its "blatant disparate treatment of Williams while allowing others to engage in extensive unacceptable behavior forecloses [it] from establishing its *Wright Line* defense that it would have discharged Williams under antidiscrimination laws even absent his protected conduct.").

Constellium timely filed a petition for review and the Board cross-applied for enforcement of its order.

## II.

Under Section 7 of the NLRA, "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." 29 U.S.C. § 157. "An employer violates Section 8(a)(3) by taking an adverse employment action . . . in order to discourage union activity." *Ozburn-Hessey Logistics, LLC v. NLRB.*, 833 F.3d 210, 217 (D.C. Cir. 2016) (internal quotation marks and citation omitted); *see* 29 U.S.C. § 158(a)(3). "The finding of a violation of Section 8(a)(3) would also trigger a violation of Section 8(a)(1)." *Napleton 1050, Inc. v. NLRB.*, 976 F.3d 30, 39 (D.C. Cir. 2020); *see* 29 U.S.C. § 158 (a)(1).

On petitions for review of an NLRB order, "we accord a very high degree of deference . . . and reverse [the Board's] findings only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Ozburn-Hessey Logistics*, 833 F.3d at 217 (cleaned up). Unless the Board's findings are "'unsupported by substantial evidence, or [the Board] acted arbitrarily or otherwise erred in applying established law to the facts of the case,'" we must uphold the

Board's order.  *Wendt Corp.*, 26 F.4th at 1008 (quoting *Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1100 (D.C. Cir, 2019)).  "Our review of the Board's conclusions as to discriminatory motive is even more deferential, because most evidence of motive is circumstantial."  *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (internal quotation marks and citation omitted).

With this standard of review and the foregoing in mind, we turn to Constellium's arguments that the Board erred in its decision once again.

A.

Constellium asserts that the General Counsel failed to establish its *prima facie* showing under *General Motors*'s initial step.  According to Petitioner, under the *General Motors* framework, Williams's writing of "whore board" does not qualify as Section 7 protected activity.  Pet'r Reply Br. 10. Constellium reasons that it tolerated employees' protected activity—the overtime boycott and protests, including use of the phrase "whore board"—for six months without disciplining an employee, a finding acknowledged in *Constellium I*.  *See* 945 F.3d at 550.  Thus, the argument goes, the record bolsters the view that Williams was fired for his offensive conduct, not for protected activity, and that Constellium held no animus.  As a result, the General Counsel cannot establish a causal relationship between Williams's termination, relating to only the offensive conduct, and the protected activity.

We disagree.  Although *General Motors LLC*, 369 NLRB No. 127 (2020), postdates *Constellium I*, it does not disrupt the law of the case that Williams's writing is protected activity. Our previous opinion held that "there is substantial evidence that Constellium disciplined Williams because of the content

of his message." *Constellium I*, 945 F.3d at 551. The relevant evidence included Constellium's admissions that it disciplined Williams "for willfully and deliberately engaging in insulting and harassing conduct on the job," J.A. 125, because of the content of his message, and that it "'took aggressive action' based upon not only '*how* [] Williams displayed the message' but also because of '*what* he wrote on Company property (a vulgar phrase 'Whore Board').'" *Constellium I*, 945 F.3d at 551 (quoting Pet'r Opening Brief, *Constellium I*, 2019 WL 2404443, at *28 (D.C. Cir. June 6, 2019)).

We observed, however, that the Board "considered the case under the *Atlantic Steel* framework, looking first to whether Williams was engaged in protected activity and then evaluating whether his conduct was egregious enough to lose protection under the Act" instead of the *Wright Line* framework, "which would require a finding of animus, namely, that Williams had been disciplined differently because he engaged in protected activity." *Id.*

The Board concluded, and this Court agreed, that Williams's writing was protected activity. Nothing in *General Motors* changes that conclusion. Rather, *General Motors* changes what else is required to find that an employer has violated Sections 8(a)(1) and (a)(3). Instead of that ultimate conclusion turning on the egregiousness of Williams's conduct, *see Atlantic Steel Co.*, 245 NLRB 814 (1979), it now turns on Constellium's motive for disciplining Williams, *Wendt Corp.*, 26 F.4th at 1010, allowing the Board to balance employers' efforts to fulfill antidiscrimination obligations against protecting Section 7 activity more holistically, as required by our mandate on remand, *see Constellium I*, 945 F.3d at 551–52. As such, Constellium's argument that Williams's writing is not protected activity in light of the Board's adoption of the *Wright Line* framework in *General*

*Motors* is misplaced. Whether the Board has otherwise erred in the rest of its *Wright Line* analysis, however, is a separate question.

B.

To that end, Constellium challenges the evidence upon which the Board found an unlawful motive in its decision to discipline Williams. Our review of the Board's decision is highly deferential, *Fort Dearborn Co.*, 827 F.3d at 1072, and we find evidence in the record to support the Board's conclusion that Constellium acted with animus when it punished only Williams for his use of the offensive term.

The Board relied on circumstantial evidence of disparate treatment of Williams, when compared to other employees, to establish animus in Constellium's discipline decision, which is strong evidence under *Tschiggfrie Properties*. 368 NLRB No. 120, at *11. It found that Constellium tolerated graffiti and the common use of vulgarities without imposing discipline, including use of the term "whore board," even by supervisors. Relying on the Board's underlying decision, it reiterated that "'there appears to have been a general laxity toward profane and vulgar language in the workplace.'" 371 NLRB No. 16, at *4 n.10 (quoting 366 NLRB 131, at *2). This "unrebutted evidence" led the Board to conclude that Constellium's decision to discipline Williams "singled [him] out from all others who engaged in similar conduct" and that this disparate treatment "evidence[d] a strong causal relationship between Williams' protected activity and [Constellium's] discharge decision, . . . precisely the type of circumstantial evidence found to establish animus under *Tschiggfrie Properties*." *Id.* at *4.

Petitioner argues, and our dissenting colleague agrees, that this was error; Williams's conduct was so unprecedented that there was no comparator upon which to establish disparate treatment. Again, we disagree. Although no other employee put pen to paper, writing the phrase "whore board," it was the content of Williams's message that led to his termination. *Constellium I*, 945 F.3d at 551. The record reflects that the label itself, used regularly in the course of protected activity, went unpunished until Williams. And as we discuss in the next section, Constellium failed to address written vulgarities as well.

At the ALJ proceeding, Constellium employees testified about the pervasive use of the term "whore board." One employee testified that "point blank . . . [the sign-up sheet] was called the whore board." J.A. 47. The employee confirmed that he used that phrase "over the radio" and in front of supervisors because "it was a running deal with us." *Id.* at 48. Even supervisors used the phrase. *Id.* Another employee testified that he heard the phrase "[a] lot" and considered it a "way of showing [employee] distaste for [the policy]." *Id.* Williams testified that he had heard a supervisor use the phrase several times and even heard it over the radio, when a foreman "ask[ed] is there anybody going to come down and sign the whore board for overtime." *Id.* at 51. Despite widespread use of the term, no employee was disciplined until Williams. Furthermore, there was no evidence that Constellium adopted and announced a policy or practice that it would no longer tolerate the use of the phrase, but that Williams subsequently used it anyway. In other words, Williams was treated differently than any other employee for his use of the phrase.

To Petitioner's credit, two managers testified that they had not been aware of the use of the phrase to describe the overtime sign-up sheet until Williams wrote it, and viewed the language

as sexually charged, inappropriate, and abnormal for the plant. J.A. 67, 69, 100–01. But dueling testimony about the use of the phrase does not render the Board's decision unreasonable. "When confronted with competing versions of evidence, we defer to the Board's credibility determinations absent the starkest error." *Consol. Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 15 (D.C. Cir. 2016). We find no such error.

The record also indicates that some employees who continued to sign-up for overtime after the implementation of the new policy suffered from the tension for months, in support of Constellium's argument that it disciplined Williams for harassing conduct. Pet'r Opening Br. 36–38. One employee present during Constellium's investigatory interviews after Williams's act reported that another employee was bothered because a friend had stopped talking to him over his decision to use the new overtime procedure. J.A. 59. Likewise, a manager testified that an employee stated that Williams's act was very offensive to him. *Id.* at 67. But the record does not evidence any effort to curb the intensity of the protest prior to Williams's termination such that the Board's finding of disparate treatment amounts to error. "We may not reject the Board's findings simply because other reasonable inferences may also be drawn." *Fort Dearborn Co.*, 827 F.3d at 1076 (citing *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125 (D.C. Cir. 2001)) (internal quotation marks omitted) (alterations accepted). "A particular form of discipline is not necessarily unlawful solely because an employer has imposed it for the first time," but in this case, protected Section 7 activity motivated Constellium's decision and enabled the Board to reasonably find a causal relationship. *St. George Warehouse, Inc. & Merch. Drivers Loc. No. 641, Int'l Bhd. of Teamsters.*, 349 NLRB 870, 879 (2007).

In sum, we agree that the General Counsel carried its initial burden under *Wright Line*. Thus, we turn to the second element of the *Wright Line* framework: whether Constellium proved that it would have disciplined Williams in response to him writing "whore board" on the sign-up sheets even in the absence of the union protest.

## C.

Here, Constellium again points to its toleration of other protests, but also relies on testimony that Williams's protected activity played no part in his termination. For instance, it cites the Company's anti-harassment policy and rules of conduct to suggest that Williams would have been terminated even in the absence of an ongoing union protest. The Board's rejection of Constellium's arguments is supported by substantial evidence.

Constellium argues that Williams "was not disciplined for vulgarity, graffiti, or profane language," but for "insulting and harassing conduct" more severe than any other at Constellium's facility. Pet'r Opening Br. 36. But the record reflects that profane, vulgar, and even harassing language could be heard routinely at Constellium, and at times, heard over the facility's internal radio system, without consequence. J.A. 39, 49. To borrow one employee's analogy: the plant's language could range from a G movie rating to NC-17; the use of "whore board" rated "PG." *Id.* at 58. The record further indicates that there was graffiti branding specific employees with nicknames in a potentially harassing fashion and graffiti containing vulgar references in public areas. *Id.* at 39.

Constellium's rules of conduct and anti-harassment policy prohibit "harassment of any kind," including "insulting or derogatory language," and consider it a "major" rule violation to "[e]ngage in malicious mischief, horseplay, or other conduct

encroaching upon the rights of . . . a fellow employee" or to "use insulting language toward fellow employees." *Id*. at 233, 242. Constellium asserts that it was particularly "sensitiv[e]" to "possible harassment in the workplace" at the time it disciplined Williams because less than a year prior, it had received an adverse jury verdict for creating a hostile work environment for two female employees. Pet'r Opening Br. 10, 46. Despite claiming to have turned over a new leaf, Constellium has not enforced its policy consistently, if at all. The Board concluded, based on substantial evidence, that even after the jury verdict, Constellium failed to comply with its "obligations under antidiscrimination laws" because the company "allow[ed] wide use" of the offensive term for several months, "until Williams alone was singled out for discipline and discharge for use of the term." *Constellium*, 371 NLRB No. 16, at *5. Under the *Wright Line* framework, the employer must demonstrate that it would have disciplined Williams absent the Section 7 activity. *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. at 401–02. Constellium's failure to enforce its code of conduct or anti-harassment policy dooms its assertion that it would have fired Williams for use of the phrase or for an offensive writing.

Constellium also emphasizes management's belief that Williams's insubordinate acts continued after being reprimanded for writing on the sign-up sheet. Specifically, management claims that the day after reprimanding Williams for his writing, Williams "continued this type of behavior in the lunchroom by making comments loud enough" that another employee could hear it and be upset by it. J.A. 85. But there is no evidence that this incident ever took place. In fact, testimony in the record in direct contradiction of Constellium's view of events casts serious doubt on the reasonableness of its belief that it did. *See Id*. at 42, 90, 102, 104, 107. In sum,

Constellium has failed to rebut the General Counsel's *prima facie* case.

D.

Finally, Constellium accuses the Board of misapplying the *Wright Line* framework such that the Board's decision still conflicts with employers' attempts to discipline impermissible misconduct in adherence to obligations under antidiscrimination laws. For some time, this Court has stressed that "where the policies of the [NLRA] conflict with another federal statute, the Board cannot ignore the other statute; instead, it must fully enforce the requirements of [the NLRA], but must do so, insofar as possible, in a manner that minimizes the impact of its actions on the policies of the other statute." *Can-Am Plumbing, Inc. v. NLRB*, 321 F.3d 145, 153–54 (D.C. Cir. 2003) (internal quotation marks and citation omitted). The Board has done just that by using a framework that provides Constellium the opportunity to prove that it would have punished Williams for his conduct separate and apart from its connection to Section 7 activity.

Constellium could have avoided NLRA liability by showing that it had a history of enforcing laws and policies against discrimination and harassment in a consistent manner, or by showing that it was turning over a new leaf in that regard when it disciplined Williams, but it showed neither. We recognize the difficulties that sometimes come with implementing new behavioral standards in the workplace. However, we find no evidence in the record that Constellium began *enforcing* any such standards prior to Williams. This is fatal. Constellium's lack of enforcement of its own anti-harassment policies and code of conduct, not the Board's assessment of the record, forecloses its rebuttal argument. The term at issue in this case is offensive, but the Board reasonably

concluded that Constellium would not have disciplined Williams for use of it absent his Section 7 activity.

## III.

An employer may defend against allegations that its act of discipline against an employee engaged in protected activity violated the NLRA by demonstrating that its motive was adherence to antidiscrimination laws. This approach addresses "the potential conflict between the [Board's] interpretation of the NLRA and Constellium's obligations under state and federal equal employment opportunity laws," *Constellium I*, 945 F.3d at 548–49, and satisfies the need for our earlier remand. The challenges to the Board's analysis under the *Wright Line* framework fail because Constellium did not prove that its actions were motivated by a desire to adhere to antidiscrimination laws. Accordingly, we deny Constellium's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: Despite the complicated treatment afforded this matter by the NLRB, it is a rather simple case. From the record in this case, and other items of public record, the petitioner is an employer that incurred a million-dollar sexual harassment judgment against it for maintaining a hostile workplace. Thereafter, an employee of Constellium posted, in a conspicuous place, on a work availability announcement, words describing his co-workers (including females) as whores. Constellium terminated the offending employee. The NLRB now has ruled that the firing of this worker for contributing to a hostile workplace was the result of anti-union animus.

In order to conclude that there was evidence to support the Board's finding in the first place, as I understand the test applicable thereafter, the accused employer must show that it would have taken the same action regardless of the protected activity, perhaps, because of a legitimate business reason. Such a legitimate business reason in this case is more than obvious. Constellium did not wish to be hit with another million-dollar judgment and wanted to avoid creating a hostile workplace. Therefore, we move to the next step of the applicable test, which is whether the tendered explanation is pretext, and whether other evidence supports a conclusion that the anti-union animus was a but-for factor in the firing. In this case, the Board cites no such evidence. The Board tells us that the evidence supports this conclusion because other workers were not similarly terminated. This, in fact, is irrelevant since no other worker had committed the same offensive act that the terminated employee did. We are asked to say that the evidence weighs enough to offset that legitimate business reason, but something outweighs nothing every time. A million-dollar judgment is in fact something. The desire to avoid a hostile workplace is in fact something. A lack of similar discipline is nothing if there isn't a similar act to

compare it to. That is the simple case. I will briefly deal with the Board's more complex handling.

In December 2012, Constellium incurred a $1 million verdict for maintaining a hostile work environment. J.A. 236–37. That case stemmed from a company practice under which the CEO would post responses to anonymous questions on company bulletin boards. J.A. 81. In one instance, the CEO posted a question and response that included several terms derogatory to women and targeted specific Constellium employees. *Id.* Two female employees then brought a lawsuit against Constellium for posting the question and response on the public bulletin boards. J.A. 81. A jury found that Constellium had maintained an unwelcome, gender based, hostile or abusive employment environment. The two plaintiffs were awarded $250,000 each in compensatory damages and $250,000 each in punitive damages. J.A. 236–37.

Thereafter, in the present case, an employee, Andrew "Jack" Williams, as a part of a larger protest of Constellium's new overtime policy, defaced two overtime signup sheets describing employees willing to participate in the new overtime scheme as "whores." Constellium suspended and ultimately terminated Williams. The NLRB has ruled that Williams's firing for contributing to a hostile workplace was actually the result of anti-union animus. *Constellium Rolled Products Ravenswood, LLC*, 371 NLRB No. 16 (Aug. 25, 2021). The court today affirms this ruling.

Under the now-applicable *Wright-Line* test, Constellium has the right to "prove it would have taken the same action even in the absence of the" protected activity. *General Motors LLC*, 369 NLRB No. 127, at *2 (July 21, 2020). In its supplemental order, the NLRB rejected Constellium's argument that, regardless of the protected activity, it would have disciplined

Williams because of its obligations to maintain a harassment free workplace. *Constellium*, 371 NLRB No. 16, at *5.

The Board supported its finding with evidence that Constellium "tolerated extensive profanity, vulgarity, and graffiti in the workplace even following its adverse jury verdict in December 2012." *Id.* According to the Board, Constellium's "blatant disparate treatment of Williams while allowing others to engage in extensive unacceptable behavior forecloses [Constellium] from establishing its *Wright Line* defense . . . ." *Id.*

The Board's factual finding that Constellium would not have disciplined Williams but for his protected activity, like all of its factual findings, must be "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e)-(f). Substantial evidence "is 'less than a preponderance of the evidence,' albeit 'more than a scintilla.'" *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (citation omitted). The Board's conclusion does not cross even this low bar.

First, in examining the whole record, we should not, like the Board before us, disregard the import of the 2012 verdict against Constellium. This verdict alone more than justifies Constellium's reaction to William's conduct. Constellium had experienced the consequences of failing to remedy a hostile work environment, particularly one hostile towards its female employees. It had every reason to respond strongly to Williams's writing "whore board" on the overtime signup sheets by punishing him for using sexually offensive language in an effort to intimidate and harass other employees. This part of the record clearly cuts in favor of Constellium meeting its rebuttal burden.

4

In its decision, the Board attempts to support its conclusion with evidence of Constellium "tolerat[ing] extensive profanity, vulgarity, and graffiti in the workplace even following its adverse jury verdict in December 2012." *Constellium*, 371 NLRB No. 16, at *5. According to the Board, there was a history of various employees using sexually explicit and vulgar language at Constellium, Response Br. at 7, and because management chose to discipline only Williams, it was because of his protected activity.

This logic fails for two reasons. First, there is no evidence in the record of any other employees engaging in conduct comparable to Williams's. The Board primarily cites to evidence of employees using explicit language in conversation, or even referring to the overtime sign-up sheet as the "whore board" to each other, but this is irrelevant. None of the referenced conduct compares to Williams's. Williams, in full view of other employees, walked up to a frequently used bulletin board and in an effort to disparage and intimidate the employees that may wish to sign up for overtime despite the boycott by other employees, wrote "whore board" at the top of both sign-up sheets. Williams knew full well that his message would be visible to anyone walking by the bulletin board. More to the point, anyone wishing to work overtime would be required to put her name under that label.

Comparing Williams's conduct with that of other employees using vulgar language is like comparing apples and oranges. The comparison provides no support for the Board's conclusion that Constellium disciplined Williams for engaging in protected activity.

Similarly, the Board's conclusion that Constellium's tolerance of vulgarity from employees indicates that Williams was disciplined out of anti-union animus is undercut by one

key fact: of all the Constellium employees engaging in the overtime boycott, only Williams, the only boycotter who engaged in such egregious, offensive conduct, was disciplined by Constellium.

When compared with other users of vulgar language, or even the term "whore board," Williams was the only employee to be disciplined. But when compared to all the employees engaged in the boycott, of which there were many, Williams was, once again, the only employee to be disciplined. While considering one of these comparisons in isolation might lead an observer to conclude that Williams was disciplined because of either his protected activity or his use of sexually explicit language, considering them together leads to no conclusion at all. The two facts cancel each other out.

When considering the record without the Board's fingers on the scales, there is no support for the conclusion that Constellium would not have disciplined Williams but for his protected activity. The only fact supporting a motive for Constellium's actions is the $1 million verdict from 2012. A desire to avoid a repeat verdict supports a conclusion that Constellium would still have disciplined Williams even if his writing on the overtime sheets was not protected activity.

Perhaps I am old fashioned, but I still believe that a finding of an unfair labor practice should reflect something unfair on the part of the employer. I see unfairness in this record, but it is not on the part of the employer. I respectfully dissent.