# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 8, 2023         Decided March 26, 2024

No. 23-1100

STERN PRODUCE COMPANY, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 23-1122

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

*Patrick R. Scully* argued the cause for petitioner. With him on the briefs were *John Alan Doran* and *John T. Melcon*.

*Eric Weitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

Before: HENDERSON and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Precedents of the National Labor Relations Board hold that an unfair labor practice occurs if the employer creates the impression that it is monitoring an employee or employees in their pro-union activity. Board precedent also holds that an employer who disciplines an employee because of the employer's "anti-union animus" commits an unfair labor practice. The Board in this case, after examining two brief workplace incidents, found the employer guilty of two unfair labor practices, one of each type. We must decide whether the evidence supports the Board's judgment.

What follows discloses, among other things, that the Board's majority and its General Counsel, at least at the time of these proceedings, should have brushed up on the ancient and wise legal doctrine *de minimis non curat lex*—that is, the law does not concern itself with trifles. Or should not.

**I.**

Stern Produce Co., an Arizona-based company, operates a wholesale produce distribution center in Phoenix. Since at least 2015, United Food and Commercial Workers, Local 99, has been trying to unionize Stern Produce's warehouse employees and truck drivers. In 2015 and 2016, this union filed unfair labor practice charges against Stern Produce, alleging that the company interfered with a scheduled representation election. *See Stern Produce Co.* ("*Stern Produce I*"), 368 N.L.R.B. No. 31, 2019 WL 3530188, at *1–2 (July 31, 2019). After the

Board's Regional Director filed a complaint based on the charges, an Administrative Law Judge held an eight-day trial featuring, as relevant here, testimony from truck drivers Uvaldo Ponce and Jose Ruiz. *Id.* at *13.

The Board in 2019 found that Stern Produce committed several violations of the National Labor Relations Act in connection with the representation election. *Id.* at *2. The Board ordered the company to cease and desist from its unlawful practices.[1] *Id.* at *7–9.

In 2020, the union again lodged charges against the company. Stern Produce had laid off all its hourly workers at the start of the COVID-19 pandemic and then brought back some drivers when business resumed. The union claimed that Stern Produce had selectively failed to recall pro-union employees and had done so in order to dilute union support in its workforce. The Board's General Counsel filed a complaint reflecting the union's claims.

Before the matter went to a hearing, the union and the company agreed in May 2021 to settle the dispute. *See Stern Produce Co.* ("*Stern Produce II*"), No. 28-CA-258619, 2021 WL 2347342 (N.L.R.B. June 7, 2021), *enforced*, No. 21-71140 (9th Cir. June 25, 2021). The company promised to recall (with backpay) the employees it had been accused of unlawfully failing to recall, including Ponce and Ruiz. In the next month the Board approved the settlement, and Stern Produce reinstated the employees. The Board's order approving the settlement, which the Ninth Circuit enforced, did not state that Stern Produce had engaged in any unlawful conduct.

---

[1] It is undisputed that Stern Produce fully complied with its remedial obligations. No representation election, however, has yet taken place.

In the case now before us, one of the charges against Stern Produce involves a text message a supervisor sent to delivery truck driver Jose Ruiz. The other charge relates to a written warning a supervisor issued to another driver, Uvaldo Ponce. The evidence with respect to each charge was as follows.

While driving a truck for the company in July 2021, Ruiz parked to take a lunch break and covered the truck's inward-facing camera. Ruiz's truck, like virtually all Stern Produce trucks, was equipped with a system transmitting real-time data to the company about the vehicle's location and operation. The truck was also fitted with one camera with a street view and another with a view of the driver and the truck's cab.

At some point later, Ruiz's supervisor, transportation manager Nick Barr, sent Ruiz a text message: "Got the uniform guy for sizing bud, and you cant cover the camera it's against company rules." When Ruiz saw the message several hours later he replied: "OK Bud muy [sic] lunchtime." The evidence showed that manager Barr did not know that Ruiz was on a lunch break. There was no set time for drivers to stop for lunch.

Ruiz testified that after this solitary incident, manager Barr "never once touched the subject ever again."

In August 2021, Ponce was at the Stern Produce facility when he heard two fellow drivers, Joe Metzgar and Mohamed Chayko, jokingly call each other "baby." Ponce told Chayko, "you know they kill people like that in your country." When Chayko asked Ponce to clarify, Ponce replied, "gays." Chayko then asked Ponce where he thought Chayko was from. Ponce guessed Afghanistan and then Iraq; Chayko told Ponce he was wrong and left the room.

The next day a supervisor who had been in the room during

the conversation recounted the incident to manager Barr, who in turn informed Stern Produce owner Bill Stern. Stern and Barr decided to investigate further, so Barr collected statements from the supervisor, from Ponce, from Chayko, and from Metzgar, who all told the same story.

After concluding their investigation, owner Stern and manager Barr consulted with human resources and concluded that because Ponce had insulted Chayko based on his perceived race, ethnicity, and sexual orientation, Ponce's conduct warranted a written warning. (A written warning constituted the second tier on the company's disciplinary scale—more serious than verbal counseling, but less serious than a final written warning or termination.)

The written warning stated that Ponce's comments violated "company policy around the use of disparaging or abusive words, phrases, slurs, and negative stereotyping." The warning also informed Ponce that further misconduct could result in more serious punishment, "up to and including" suspension or termination.

The union filed unfair-labor-practice charges based on these two incidents. The Board's General Counsel issued a complaint, alleging that Stern Produce had created an impression of surveillance of organizing activities by making Ruiz aware that he was being watched, and that Ponce's union support motivated Stern Produce's decision to give him a written warning for a first-time offense.

In its defense, Stern Produce claimed that it had treated Ruiz and Ponce consistently with its policies. Manager Barr's message to Ruiz, the company asserted, merely reminded Ruiz of longstanding company policy. In its employee handbook, Stern Produce reserved the right to "monitor, intercept, and/or

review" any data in its systems and to inspect company property at any time without notice. The handbook further instructed drivers that they "should have no expectation of privacy" in any information stored or recorded on company systems, including "[c]losed-circuit television" systems, or in any company property, including vehicles. And directly on point, the driver manual instructed drivers that "[a]ll vehicle safety systems, telematics, and dash-cams must remain on at all times unless specifically authorized to turn them off or disconnect." Making sure that the cameras remained operational was important given their functions, which included preventing unsafe driving and protecting drivers from liability for accidents for which they are not at fault.

Stern Produce also relied on company policies to explain the warning it had issued to Ponce. It cited its equal employment opportunity policy prohibiting workplace harassment "based upon" race, color, national origin, ancestry, sex, or sexual orientation. Company policy also banned conduct that "insults or shows hostility or aversion" toward an individual based on a protected status, including the use of "disparaging or abusive" language and "negative stereotyping."

The Administrative Law Judge sided with Stern Produce. The ALJ found that the message to Ruiz did not create an impression of surveillance, since manager Barr had engaged in "mere observation" in line with "longstanding company policies" about truck cameras. As for the warning to Ponce, the ALJ determined that it had not been motivated by Ponce's pro-union activities. The ALJ found that Stern Produce had issued the warning without knowing if Ponce was still involved with the union, and that the company had acted based on Ponce's offensive and discriminatory comments, rather than any anti-union animus.

The Board reversed on both issues. *Stern Produce Co.*, 372 N.L.R.B. No. 74, 2023 WL 2913118 (Apr. 11, 2023). It held that Barr's surveillance of Ruiz was "out of the ordinary" in light of Ruiz's history of union-related conflicts with the company and Barr's lack of justification for needing to view Ruiz's camera. *Id.* at *3–4. Barr did not usually look at a camera's video feed unless there was a driver or vehicle safety concern, and he had never previously texted drivers about their cameras. *Id.* at *4. His "sudden and unusual interest" in viewing Ruiz's camera, the Board found, created an impression of surveillance. *Id.*

As for Ponce, the Board determined that Stern Produce was motivated by anti-union animus in issuing him a written warning rather than verbal counseling. *Id.* at *5–8. The Board found that Stern Produce knew of Ponce's involvement in the organizing drive. *Id.* at *6. It also found that the company had a discriminatory motivation for disciplining Ponce, based on its history of labor-law violations (some of which had impacted Ponce directly), the short period of time between Ponce's reinstatement and the warning, and the disparity in treatment between Ponce and other employees who had engaged in supposedly similar misconduct. *Id.* at *7. The disparate treatment finding also led the Board to reject Stern Produce's defense that Ponce would have faced discipline even if he had not engaged in pro-union efforts. *Id.* at *8.

## II.

Stern Produce's petition for judicial review presents the question whether the Board's conclusions are "supported by substantial evidence on the record as a whole. Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359,

366–67 (1998) (internal citations and footnote omitted).

We consider first the Board's finding that manager Barr's text message to Ruiz—"you cant cover the camera it's against company rules"—gave Ruiz the impression that the company was conducting surveillance of him in his pro-union activities. The Board decided that Stern Produce thereby violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1). This section prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the[ir] rights" guaranteed under the Act. *Id.*; *see also id.* § 157. Under Board precedent, a practice is unlawful if it has a "reasonable tendency" to coerce employees in the exercise of their rights. *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001).

The Board has held that an employer tends to coerce employees if it creates an "impression" that it is conducting surveillance of employees "concerning the exercise of rights guaranteed by the Act." *CBS Recs. Div.*, 223 N.L.R.B. 709, 709 (1976). An unlawful impression of surveillance arises if an employer's conduct would lead a reasonable employee to believe that his "union or other protected activities had been placed under surveillance." *Frontier Tel. of Rochester, Inc.*, 344 N.L.R.B. 1270, 1276 (2005), *enforced*, 181 F. App'x 85 (2d Cir. 2006).

The Board found such an impression of surveillance here based on Barr's "interaction" with Ruiz—that is, a single phrase in one text message on a subject the manager never mentioned again. Considering the record "as a whole," 29 U.S.C. § 160(e), we cannot sustain that finding.

The undisputed facts—including the testimony of Ruiz—establish that Stern Produce drivers are aware that supervisors

may (or may not) be monitoring their conduct through the cameras in their trucks at any time. In fact, the company puts drivers on notice that cameras "must remain on at all times" and informs them that they have no expectation of privacy in their trucks, which can be inspected without notice. Yet the Board determined that there was no evidence that Ruiz violated this instruction when he prevented the camera from functioning during his lunch break. To quote from the Supreme Court's leading substantial evidence case, the Board's explanation is "nonsense." *Allentown Mack*, 522 U.S. at 376. There is nothing ambiguous about "at all times."

Under typical circumstances, a reasonable driver would have no basis to think that he was being watched through his truck camera for the purpose of determining if he was engaging in any "union or other protected activities." *Frontier Tel.*, 344 N.L.R.B. at 1276. After all, a driver who knows he can be monitored (1) at any time, (2) without warning, and (3) for any reason, has every reason to expect to be watched while on the job—and, without more, no reason to assume that any particular instance of monitoring reflects an attempt by the company to weed out or suppress union activities. That logic rings especially true because there is no evidence that union activity had ever "take[n] place in the small cab of a produce delivery truck," as Stern Produce puts it, while a driver was out on the road alone.

Any assumption a driver in Ruiz's circumstances could have made about being monitored for union-related reasons would have been based not on reasonable inferences, but on "speculation." *Cannon Indus.*, 291 N.L.R.B. 632, 638 (1988). That cannot sustain the Board's finding. *See Beverly Cal. Corp. v. NLRB*, 227 F.3d 817, 835 (7th Cir. 2000). The Board's guesswork is particularly unsound because it undermines the leeway that Section 8(a)(1) affords employers to monitor

employee conduct—including union activity—on company premises. *See Bellagio, LLC v. NLRB*, 854 F.3d 703, 711 (D.C. Cir. 2017).

The Board also asserted that Barr's decision to text Ruiz about the camera infraction—which had the effect of alerting Ruiz to the surveillance—gave cause for suspicion because it was inconsistent with Barr's prior behavior. The Board's precedents, however, required it to focus squarely on what an "employee would reasonably assume" under the circumstances. *Fred'k Wallace & Son, Inc.*, 331 N.L.R.B. 914, 914 (2000) (quoting *Flexsteel Indus.*, 311 N.L.R.B. 257, 257 (1993)). Ruiz admitted that he had no insight into Barr's surveillance habits. So it is of no moment that Barr did not typically access truck cameras in circumstances like these—and that he had not previously texted employees about having their cameras hidden.

What Ruiz did know (or reasonably should have known, based on clear and emphatic language in company manuals) was that he could be monitored at any time. He also knew that, because he could take a break whenever he chose, Barr was unaware that Ruiz received the text message when he was stopped for lunch. (In fact, Ruiz responded to Barr's text hours later with "muy [sic] lunchtime.") And the only other driver who had been caught with a covered camera had received a verbal reprimand from Barr. Viewing the evidence from a reasonable employee's perspective—as the Board's precedents require—there is scarcely anything in the record to support the Board's finding that Barr's text message would have come across as out of the ordinary, coercive, or intimidating.[2] *See*

---

[2] Stern Produce defends the surveillance as "necessary to the furtherance of [a] legitimate business interest." *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 420 (D.C. Cir. 1996) (quoting *The Broadway*, 267 N.L.R.B. 385, 401 (1983)). The company claims a strong interest in using the cameras to ensure employee and vehicle

*Bellagio*, 854 F.3d at 711–12; *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 235–36 (4th Cir. 2015).

We recognize that Ruiz was a known supporter of the union organizing drive and that he had previously been subjected to unfair labor practices. But those facts cannot automatically render suspect any interaction between him and management in perpetuity. An employer does not wade "into territory violative of the Act" because of a "single remark made to an employee who was known to the management as a union supporter" that does not refer—directly or indirectly—"to the employee's union activity." *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 113–14 (1st Cir. 1978); *see also Beverly Cal. Corp.*, 227 F.3d at 835.

Of the precedents the Board cited in its decision, each one found unlawful surveillance based on much more intensive or prolonged observation of union employees. *See Stoughton Trailers, Inc.*, 234 N.L.R.B. 1203, 1205–07 (1978); *K-Mart Corp.*, 255 N.L.R.B. 922, 924 (1981), *enforced*, 676 F.2d 710 (9th Cir. 1982); *Fieldcrest Cannon, Inc.*, 318 N.L.R.B. 470, 500–03 (1995), *enforced in relevant part*, 97 F.3d 65 (4th Cir. 1996) (en banc). Our own decisions have similarly upheld findings of impressions of surveillance that were premised on elevated or abnormal scrutiny of pro-union employees. *See,*

---

safety. But Barr never testified why he needed to look at Ruiz's camera on the day he sent the text message. Stern Produce belatedly asserts in its reply brief that Barr pulled up Ruiz's route before texting him to confirm that he was not driving, and the system automatically displayed the camera feed alongside Ruiz's location.

That explanation, while consistent with the record, is not "self-evident" enough to plug the evidentiary gap on its own. *United Food & Com. Workers Union Loc. 204 v. NLRB*, 506 F.3d 1078, 1086–87 (D.C. Cir. 2007). Even if we disregard Stern Produce's claim, what matters is that the information available to Ruiz gave him no good reason to suspect that the monitoring was abnormal.

12

*e.g.*, *Bellagio*, 854 F.3d at 712 (citing *Parsippany Hotel Mgmt.*, 99 F.3d at 419–20, and *Sands Hotel & Casino*, 306 N.L.R.B. 172, 189 (1992), *enforced sub nom. S.J.P.R., Inc. v. NLRB*, 993 F.2d 913 (D.C. Cir. 1993)).

The "very brief," and not "out of the ordinary," observation of Ruiz was "qualitatively different." *Bellagio*, 854 F.3d at 712. As far as Ruiz could tell, Barr had watched him in line with company protocol. The one-off warning not to cover his camera did not refer to union activity. Nor did it suggest in any way that Ruiz had been singled out because of his support for the union.

At bottom, the Board's errors reveal just how far it strayed from its statutory mandate. Its finding of a Section 8(a)(1) violation cannot be squared with any reasonable understanding of that provision's prohibition on practices that "coerce employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1); *see, e.g.*, *Webster's New International Dictionary* 519 (2d ed. 1934) ("coerce" is "[t]o constrain or restrain by force, esp. by law or authority; to repress; curb"; "[t]o compel to any action"; or "[t]o compel or enforce"); 2 *The Oxford English Dictionary* 587 (1933) (similar). Indeed, the Board altogether "ignore[d] [the] critical coercion element" inherent in Section 8(a)(1)'s plain text. *NCRNC, LLC v. NLRB*, --- F.4th ----, 2024 WL 876347, at *4 (D.C. Cir. Mar. 1, 2024) (second alteration in original) (quoting *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015)); *accord Belcher Towing Co. v. NLRB*, 726 F.2d 705, 708 (11th Cir. 1984).

The Board's misguided attempt to find a labor-law violation in one text message is "the product of a familiar phenomenon": years ago the Board took an expansive view of the scope of the Act and then, over time, it "presse[d] the rationale of that

expansion to the limits of its logic." *NLRB v. Int'l Bhd. of Elec. Workers, Loc. 340*, 481 U.S. 573, 597 (1987) (Scalia, J., concurring in judgment). The Board then focused its analysis here not on the statutory text—the "authoritative source of the law"—but on its own constructions of (its own constructions of) the Act. *Id.* at 597–98. The Board extended the Act's prohibition on "coerc[ing]" employees to first reach acts that "reasonably tend[]" to coerce, *e.g.*, *Blue Flash Express, Inc.*, 109 N.L.R.B. 591, 593 (1954); then acts that create an impression of surveillance, *e.g.*, *Harrington & Richardson, Inc.*, 136 N.L.R.B. 1095, 1098 (1962); and then "out of the ordinary" actual or perceived surveillance of pro-union activity, *e.g.*, *Metal Indus., Inc.*, 251 N.L.R.B. 1523, 1523 (1980).

Relying on that logical progression, the Board here went one step further, asserting that a single communication to a pro-union employee referencing a generally applicable policy of employee monitoring fell within Section 8(a)(1)'s ambit as "out of the ordinary" surveillance. That argument, as explained, stretches Board precedent so far that not even "fidelity to [the] logic" of those prior decisions can sustain the Board's finding. *Int'l Bhd. of Elec. Workers*, 481 U.S. at 598 (Scalia, J., concurring in judgment). More importantly, nor can "obedience to [the] text" of the Act. *Id.*

Faced with a Board decision that made similar errors, Justice Scalia borrowed some wisdom from another Supreme Court decision that rings equally true here:

> The seductive plausibility of single steps in a chain of evolutionary development of a legal rule is often not perceived until a third, fourth, or fifth 'logical' extension occurs. Each step, when taken, appeared a reasonable step in relation to that which preceded it, although the aggregate or

> end result is one that would never have been seriously considered in the first instance. This kind of gestative propensity calls for the 'line drawing' familiar in the judicial, as in the legislative process: 'thus far but not beyond.'

*Id.* (quoting *United States v. 12 200-ft. Reels of Film*, 413 U.S. 123, 127 (1973)). Rather than drifting "further and further from the meaning of the [Act]," *id.*, we conclude that the Board lacked substantial evidence to find that the text message to Ruiz violated Section 8(a)(1).

**III.**

Stern Produce also argues against the Board's finding that the written warning to Ponce amounted to discrimination against protected activity in violation of Sections 8(a)(1), (3), and (4) of the Act, 29 U.S.C. § 158(a)(1), (3), and (4). Those provisions prohibit employers from punishing employees in retaliation for participating in Board proceedings or unionization efforts.[3] *See Parsippany Hotel Mgmt.*, 99 F.3d at 422.

In particular, the Board has held that an employer may not discipline an employee because of "anti-union animus." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983) (discussing *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981)). In other words, an employer violates the Act if

---

[3] Section 8(a)(3) bars employers from discriminating against employees to discourage them from union membership. 29 U.S.C. § 158(a)(3). Section 8(a)(4) prohibits discrimination against an employee "because he has filed charges [with the Board] or given testimony" in a Board proceeding. *Id.* § 158(a)(4). Violating either of those provisions automatically results in a derivative violation of Section 8(a)(1). *See Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217–18 (D.C. Cir. 2016).

the employee's protected conduct is a "substantial or motivating factor in the adverse action." *Id.*

To determine an employer's motivation for taking adverse action against an employee, the Board applies its *Wright Line* framework. *See Bally's Park Place v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011). Under *Wright Line*, the General Counsel must first establish that (1) the employee engaged in protected activity, (2) the employer knew about it, and (3) the employer had "animus" against the activity. *Constellium Rolled Prods. Ravenswood, LLC v. NLRB*, 45 F.4th 234, 239–40 (D.C. Cir. 2022) (citation omitted); *see Wright Line*, 251 N.L.R.B. at 1089. The General Counsel's *prima facie* case must suffice to allow the Board to infer that the employer acted with an improper motive. *Ozburn-Hessey*, 833 F.3d at 218. The employer then can rebut that inference by showing that it would have punished the employee even if he had not engaged in protected activity. *Constellium*, 45 F.4th at 240.

The Board found that the General Counsel made out the first two elements of the *prima facie* case. It is undisputed that Ponce played an active role in the organizing efforts among the drivers at Stern Produce. The General Counsel also produced adequate proof that Stern Produce knew of Ponce's protected activities. Ponce had been an open union activist and a member of the union drive leadership committee since at least 2015. He testified in the first Board proceeding and was named in the union's charges—a fact that Stern Produce leadership broadcast to employees in meetings intended to discourage union support. *Stern Produce I*, 2019 WL 3530188, at *13. He was one of the union supporters that the company agreed to reinstate as part of the settlement in *Stern Produce II*. 2021 WL 2347342, at *2. And in their testimony in this proceeding, Stern Produce leaders admitted that they knew of his involvement in the union drive. Those facts are enough to sustain the finding that Stern Produce

knew Ponce had been engaged in protected conduct.

Stern Produce claims that none of the General Counsel's evidence demonstrates that the company knew when it disciplined Ponce that he was "contemporaneous[ly]" involved with organizing efforts. That may be so, but the record shows that Ponce's union activism was both longstanding and ongoing. It was reasonable to infer, as the Board did, that Ponce continued to support unionization in the first few months following his reinstatement.

As to the third element of the *prima facie* case, however, the Board fell short in finding that the General Counsel sufficiently established Stern Produce's anti-union animus. An employer's "[s]imple animus" and "general hostility" toward the union are insufficient on their own. *Nichols Aluminum, LLC v. NLRB,* 797 F.3d 548, 554–55 (8th Cir. 2015) (citation omitted); *accord Intertape Polymer Corp.*, 372 N.L.R.B. No. 133, 2023 WL 9291828, at *10–11 (Aug. 25, 2023). Rather, there must be something more to connect the employer's animus to the adverse action. *See Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880, 886 (8th Cir. 2018); *AutoNation, Inc. v. NLRB*, 801 F.3d 767, 774 (7th Cir. 2015).

*Wright Line*, after all, sets forth a "causation test" that is designed to determine whether an employee's protected conduct was a "motivating factor" in the employer's action. 251 N.L.R.B. at 1089; *Transp. Mgmt. Corp.*, 462 U.S. at 401. The causation requirement gives effect to the Act's language, which prohibits an employer's adverse action only if it was connected to union activities—specifically, if the employer discriminated "to encourage or discourage [union] membership," 29 U.S.C. § 158(a)(3), or "because [the employee] ha[d] filed charges or given testimony" before the Board, *id.* § 158(a)(4).

17

This means that the General Counsel must present evidence of animus that, when coupled with the employer's knowledge of the employee's protected conduct, suffices to support a "reasonable inference" that a "causal relationship"—or, put otherwise, a "link," or a "nexus"—existed between the employee's union activity and the employer's adverse action. *Tschiggfrie Props., Ltd.*, 368 N.L.R.B. No. 120, 2019 WL 6320585, at *8, *11 (Nov. 22, 2019); *Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1328 (D.C. Cir. 2012) (quoting *Tracker Marine, LLC*, 337 N.L.R.B. 644, 646 (2002)).

The General Counsel failed to clear that bar here. The evidence was not sufficient to sustain a reasonable inference that Ponce's protected conduct caused Stern Produce to issue the written warning to him.

Most obviously, there is nothing to the General Counsel's citation of the text message to Ruiz as a labor violation tending to show that Stern Produce had anti-union animus. *See Austal USA, LLC*, 356 N.L.R.B. 363, 364 (2010). We have concluded that the incident with Ruiz did not violate the Act, so it carries no such weight.

Also inadequate is Stern Produce's alleged anti-union conduct in 2020.[4] The Board inferred animus from (1) the union's claim that the company refused to recall drivers who supported the organizing drive, including Ponce, and (2) the short period between Stern Produce's reinstatement of Ponce pursuant to the settlement agreement and the issuance of the

---

[4] The Board claims we lack jurisdiction to consider this issue because Stern Produce did not raise it before the Board. *See* 29 U.S.C. § 160(e). In its brief defending the ALJ's decision, Stern Produce argued that the General Counsel was wrong to rely on unsupported "allegations concerning Stern's 'recidivism.'" That adequately preserved the issue.

written warning.

But the allegations of anti-union hostility were just that: allegations. Stern Produce insists that it made a "business decision" to settle the charges rather than fight them before the Board (especially since the company was experiencing a labor shortage), and the Board does not question that explanation. Although the Board's order approving the settlement ordered Stern Produce to "[c]ease and desist from" selectively recalling, firing, or refusing to reinstate certain employees, the Board never found that the company had done any of those things. *Stern Produce II*, 2021 WL 2347342, at *1. Nor did the Ninth Circuit, in enforcing the order, address the substance of the General Counsel's complaint. *See* Order, *NLRB v. Stern Produce Co.*, No. 21-71140 (9th Cir. June 25, 2021).

All the Board had to go on in that proceeding were the union's allegations (as endorsed by the General Counsel), which were never tested in an adversarial process and which did not result in factfinding by a neutral decisionmaker. The Board, however, treated the charges as if they were evidence establishing Stern Produce's "prior treatment" of Ponce.

That approach is—to repeat once more the Supreme Court's statement in *Allentown Mack*—"nonsense." The sole decision the Board cited to justify its approach merely holds that "evidence from [a] settled case" is relevant and admissible for the purpose of determining an employer's motive. *St. Mary's Nursing Home*, 342 N.L.R.B. 979, 980 (2004), *enforced*, 240 F. App'x 8 (6th Cir. 2007). It does not support the proposition that mere *allegations*, unsupported by record evidence, can be used against the employer as proof in future matters before the Board. The General Counsel did not attempt to substantiate the allegations from *Stern Produce II* in this proceeding; those claims remain unproven and untested.

It follows that the Board also erred in giving weight to the short amount of time between Ponce's reinstatement and the warning. As a general principle, the timing of an employer's adverse action can shed light on its causes. *Tasty Baking*, 254 F.3d at 126. Specifically, the Board has inferred improper motive when an employer disciplined an employee who had recently returned to the workplace after an unlawful discharge or failure to recall. *See FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 785–88 (6th Cir. 2002); *Mesnikoff* [*Mid-State Broad. Co.*], 248 N.L.R.B. 1206, 1206–07 (1980), *enforced*, 636 F.2d 1209 (3d Cir. 1980).

Here, though, neither the Board nor any court has found that Stern Produce acted unlawfully in failing to recall Ponce. All the record tells us is that the company agreed to bring him back as part of the settlement. That distinguishes this case from one in which a company punishes an employee in violation of the Act and is forced to remedy the situation but then takes further adverse action against the employee. In such a case, the short timeframe between the return to work and the new adverse action may suggest that the employer—still motivated by the ill intent that inspired the original punishment—"seize[d] upon" the first available "opportunity" (as the Board puts it) to retaliate against the worker for being pro-union.

When the initial adverse action was not unlawful, it provides no insight into the employer's attitude toward the union or the causes of the employer's discipline of a pro-union employee. As a result, the discharge or the failure to recall does not cast a pall over any later adverse actions taken against the employee. To nonetheless draw a negative inference against Stern Produce in those circumstances, as the Board did here, is irrational and unsupported by precedent.

The Board stood on slightly better footing in relying on

Stern Produce's 2015 and 2016 misconduct. Those actions were at least proven by the General Counsel and found by the Board to have violated multiple provisions of the Act.

Yet that evidence, too, provides little if any insight into Stern Produce's motivations in 2021. The Board in *Stern Produce I* reasoned that the remedies it ordered would "dissipate the effects" of the company's unlawful acts, emphasizing that "over 3-1/2 years ha[d] elapsed" since those violations. *Stern Produce I*, 2019 WL 3530188, at *1, *5–6. Stern Produce implemented the remedies as ordered.

The Board's 2019 findings thus undercut its current attempt to characterize the company's infractions as "recent history" reflecting an unbroken anti-union campaign. If anything, the two additional years between *Stern Produce I* and the events in this case put the company's prior misconduct even beyond the rearview mirror. The Board cited no precedent supporting its decision to reach back half a decade to find evidence of animus. Its decisions approve only reliance on "contemporaneous" unfair labor practices. *Intertape Polymer Corp.*, 2023 WL 9291828, at *7, *14; *see also Parsippany Hotel Mgmt.*, 99 F.3d at 424. That does not give the General Counsel the green light to cite every labor-law violation a company has ever committed as evidence of its anti-union animus.

Only one piece of evidence remains: what the Board characterized as Stern Produce's "disparate treatment" of Ponce. The Board believes that an employer's harsher treatment of an employee engaged in protected activity, as compared to its handling of others who committed similar misconduct, can be "strong evidence" of wrongful animus. *Constellium*, 45 F.4th at 242 (citing *Tschiggfrie Props.*, 2019 WL 6320585, at *11).

Here the Board found a "departure" from past practice in

the fact that Ponce's was the only written warning issued "for a first infraction involving offensive language." But the General Counsel offered only two examples to establish past practice: one incident when an employee made multiple sexist remarks to a coworker that resulted in verbal counseling, and another when an employee's racist language garnered him a written warning stating that it was "the 2d time this issue had been addressed."[5]

Even if Ponce's misconduct sufficiently resembled that of the other disciplined employees, the General Counsel did not present enough evidence to permit a reasonable inference that Ponce was "singled out" for especially harsh punishment. *Constellium*, 45 F.4th at 242–43. An "isolated and marginal deviation" from an employer's policy "fails to show that the policy was not applied in a neutral manner." *Kelly Constr. of Ind., Inc.*, 333 N.L.R.B. 1272, 1272 (2001); *see also St. George Warehouse, Inc.*, 349 N.L.R.B. 870, 879 (2007). A grand total of two instances does not a pattern make. It is a leap to say that failing to adjudicate Ponce's case perfectly in line with those two incidents reflected a deviation from an otherwise consistently observed norm.

That is particularly true at Stern Produce, where the disciplinary policy itself leaves room for flexible, case-by-case resolution. The company "encourages" a progressive discipline system, in which each subsequent infraction results in escalating consequences. In the same breath, though, the policy stresses that the company "is not required to engage in progressive discipline"; "is not obligated to follow any disciplinary or grievance procedure"; and "may discipline or terminate employees" at any time "without any prior warning," depending

---

[5] One other example, involving a driver who received a verbal warning for calling a coworker "stupid," did not involve offensive language of the sort at issue in the other incidents and so proved a poor comparator. The Board did not rely on this incident.

on the circumstances of the misconduct. Company leadership testified that they handled disciplinary decisions in accord with those caveats.

Again, the Board's failure to grapple with the company's formal rules and standard practices undermines its findings. The Board asserted that Ponce's written warning was the only example of deviation from the progressive discipline system—but the General Counsel only mustered two examples when the company *did* follow the system. If Stern Produce held itself out as not bound to adhere unfailingly to a progressive approach, the mere fact of different outcomes in different cases does not, without more, support a reasonable inference that something nefarious was afoot.[6]

So, where does all of this lead? Stern Produce issued Ponce a written warning that was facially consistent with the company's equal employment opportunity policy. The General Counsel put forward no evidence bearing on Stern Produce's motivations in the leadup to the warning that would suggest that Ponce was punished for improper reasons, other than an insufficiently proven claim that Ponce's discipline was unusually severe. As for the separate incidents of alleged or adjudicated violations of the Act, those did not constitute convincing evidence that Stern Produce disciplined Ponce out of anti-union animus.

The Board lacked substantial record evidence to find that the General Counsel satisfied *Wright Line*'s *prima facie* "causation test." *Wright Line*, 251 N.L.R.B. at 1089. The charges premised on the written warning to Ponce therefore

---

[6] Even the supposed disparity in punishments fades under closer scrutiny: counseling, the lowest tier of discipline, results in a written corrective action form that documents the misconduct—just like written warnings.

fail.[7]

\* \* \*

The Board lacked substantial evidence to find that Stern Produce violated the National Labor Relations Act. Stern Produce's petition for judicial review is therefore granted, and the Board's decision and order are vacated. The Board's cross-application for enforcement is therefore denied.

*So ordered.*

---

[7] We need not consider whether Stern Produce met its burden at the second "step" of *Wright Line* to show that it would have disciplined Ponce even if he had not supported the union.