# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 9, 2023        Decided May 31, 2024

No. 22-1320

ABSOLUTE HEALTHCARE, D/B/A CURALEAF ARIZONA,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 23-1009

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Jeffrey E. Dilger* argued the cause for petitioner. On the briefs were *Maurice Baskin*, *Stefan Marculewicz*, and *Emily Carapella*.

*Barbara Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*,

Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: MILLETT and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Concurring opinion filed by *Circuit Judge* WALKER.

MILLETT, *Circuit Judge*: Absolute Healthcare, which does business as Curaleaf, operates medical marijuana dispensaries throughout the United States. The National Labor Relations Board found that Curaleaf committed four unfair labor practices, including unlawfully firing an employee for trying to unionize a Curaleaf store in Gilbert, Arizona. The Board also ordered Curaleaf to read aloud to its Gilbert-based employees a notice describing the Board's findings and to grant the union access to Curaleaf's Gilbert store.

Because the Board's unlawful-discharge finding is not supported by substantial evidence, we grant Curaleaf's petition for review and deny the Board's cross-application for enforcement as to the unlawful-discharge finding and the notice-reading and union-access remedies. We grant the Board's cross-application for enforcement as to Curaleaf's three uncontested unfair labor practices.

**I**

**A**

The National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, protects the right of employees to engage in "self-organization, [and] to form, join, or assist labor organizations," *id.* § 157. To that end, the Act prohibits employers from "interfer[ing] with,

restrain[ing], or coerc[ing] employees in the exercise of th[ose] rights[.]" *Id.* § 158(a)(1). It also prohibits employers from "discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" *Id.* § 158(a)(3). An aggrieved employee can file an unfair labor practice charge with the National Labor Relations Board. 29 C.F.R. § 101.2.

To determine whether an employer's discipline of an employee is an unfair labor practice, the Board applies the *Wright Line* test. *See Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015); *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1089 (1980); *see also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 401–403 (1983) (approving *Wright Line* test). That test has two steps. First, the General Counsel for the Board must demonstrate that the employer disciplined an employee for engaging in protected activity. *See Inova*, 795 F.3d at 80. Second, once the General Counsel makes that initial showing, "the burden of persuasion shifts to the employer to show that it would have taken the same action in the absence of the unlawful motive." *Id.* (quotation marks omitted).

If the Board finds an unfair labor practice, it has broad discretion to issue remedies designed to "effectuate the policies of the Act." *United Steelworkers of America v. NLRB*, 646 F.2d 616, 629 (D.C. Cir. 1981); *see Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1954). In appropriate cases, the Board may order "extraordinary remedies" such as requiring an employer to read aloud a notice of the Board's finding of unfair labor practices or to provide the union access to the employer's facilities to speak with employees. *See HTH Corp. v. NLRB*, 823 F.3d 668, 674 (D.C. Cir. 2016) (notice reading); *United Steelworkers*, 646 F.2d at 638 (union access).

4

Before imposing such extraordinary remedies, the Board must explain why "traditional remedies [do not] suffice." *HTH*, 823 F.3d at 674.

## B

### 1

Curaleaf operates medical marijuana dispensaries throughout the United States, including one in Gilbert, Arizona ("Curaleaf Gilbert"). Curaleaf Gilbert employs sales associates called "budtenders."

Budtenders have two duties relevant to this case. First, they must dispense or "allot" marijuana in compliance with Arizona state law and log each allotment in both Curaleaf's inventory system and the Arizona government's program for tracking allotments statewide for each patient. ALJ Hr'g Tr. ("Tr.") 129:2–130:4. Second, since Curaleaf stores are cash-only, budtenders must handle cash and ensure that the cash in the register drawer matches what the inventory system says should be in the drawer. Tr. 29:10–17. Drawer discrepancies greater than $5 violate Curaleaf policy. Tr. 135:9–25.

Employees who do not comply with Curaleaf policies and state law when allotting marijuana or handling cash may be disciplined. Curaleaf employs a four-step progressive discipline policy that proceeds as (1) "verbal warning/counseling"; (2) "written warning"; (3) "final written warning"; and (4) "separation of employment." J.A. 175; *see* J.A. 174–176. Curaleaf's policy reserves to Curaleaf the right to "elect, at its sole discretion, to forgo progressive discipline altogether, to move to a higher level of disciplinary action, or to move directly to the immediate separation of employment." J.A. 174. According to undisputed testimony by Curaleaf's human resources director, Curaleaf does not differentiate

between types of policy violations when escalating discipline. Tr. 153:15–154:15. As a result, an employee's cash-handling violation could trigger the first step and a later allotment violation could trigger the second. Curaleaf would not start a separate discipline process for the allotment violation. *See id.*

**2**

In 2020, Curaleaf Gilbert employed Anissa Keane as a budtender.

Keane committed a litany of missteps as a budtender. In April 2020, Keane received a verbal warning because her cash drawer was short $10. *Absolute Healthcare*, 372 N.L.R.B. No. 16, at 2 (2022) ("Board Order").

Just a few weeks later, Keane made seven errors in a single transaction, including failing to check the patient's medical card, dispensing the wrong quantity of marijuana, and failing to log the allotments. Board Order 2; J.A. 134–135 (written warning). A senior Curaleaf Arizona manager called this transaction a "night mare transaction," J.A. 139, and later testified that the transaction "was, in [his] five-and-a-half years, the most horrendous transaction [he had] ever seen," Tr. 139:9–10. Similarly, a Curaleaf Gilbert manager sent an email at the time saying that he had "never come across a transaction that is quite this bad" in his "4 years of management[.]" J.A. 139. Per its discipline policy, Curaleaf issued Keane a step-two written warning for her mistakes. J.A. 134–135.

Then, in July 2020, Keane made three more allotment errors in a single transaction, including ringing up a transaction on the wrong patient profile with an expired medical card. Board Order 2. While the Curaleaf human resources director found the errors "extreme," the director said that because Keane's prior warnings were "verbal/written [Curaleaf] will

need to make this her last and final warning." J.A. 142. Curaleaf then issued Keane a final written warning. J.A. 136–137.

After learning of Keane's July 2020 mistakes but before issuing that final written warning, Curaleaf management became aware that Keane was trying to unionize the Gilbert store. Board Order 1. Curaleaf management then discussed how to respond to the unionization effort. *Id.* About a month later, Curaleaf Gilbert held two mandatory employee information sessions to discuss unionization. *Id.* During one of the sessions, a Curaleaf human resources director stated that

> employees would receive "better discounts" on dispensary products if they did not unionize, that unionizing would result in employees losing their tips, and that "the person trying to organize the Union was just trying to get a job with the Union because she would get paid more."

Board Order 2; *see* Tr. 61:11–62:25 (testimony of Keane). While the director did not identify Keane by name, Keane was the only female union organizer working at Curaleaf Gilbert. Board Order 3.

In August 2020—less than a month after the information sessions—Keane's cash drawer was short $20. Board Order 2. At first, an assistant Curaleaf Gilbert store manager told Keane that she would not be fired because "it would take at least four cash-handling violations to be fired." *Id.* Senior managers disagreed with the assistant manager's understanding of Curaleaf's policy and, because of Keane's already-lengthy record of infractions and final warning, Curaleaf fired Keane. *See* J.A. 138 (termination notice).

Keane's termination notice identified the August 2020 cash shortage and her three prior disciplinary actions as the sole bases for her firing.  J.A. 138.

**3**

The Board's General Counsel charged Curaleaf with four violations of the National Labor Relations Act for (1) "creating an impression that employees were under surveillance," (2) "threaten[ing] employees with losing tips if they formed a union," (3) "promis[ing] employees benefits if they did not form a union," and (4) "discharging Keane for allegedly engaging in protected and concerted activities."  Board Order 12.  An administrative law judge found for the General Counsel on all four charges.  *Id.*  The ALJ ordered Curaleaf to reinstate Keane with backpay, to read aloud a notice of the unfair labor practice findings to Curaleaf Gilbert employees, and to grant the union access to Curaleaf Gilbert's facilities any time Curaleaf spoke to its employees about unionization.  Board Order 16–17.

Curaleaf appealed to the Board, challenging only the unlawful-discharge finding and the notice-reading and union-access remedies.  Board Order 1, 5; *see id.* 1 n.2 (noting that Curaleaf did not challenge the other three violations).

A divided three-member panel of the Board affirmed the ALJ.  At *Wright Line* step one, the Board majority found that the timing of Keane's firing, Curaleaf's other uncontested labor violations, Curaleaf's singling out of Keane at the information session, and Curaleaf's disparate treatment of Keane together demonstrated that Curaleaf fired Keane out of anti-union animus.  Board Order 2–3.

As evidence of disparate treatment, the Board pointed to Tyler Tanselle-Hubbard, who was the "top salesman" at

Curaleaf's Camelback, Arizona store and the only other Curaleaf employee fired under Curaleaf's four-step policy. Tr. 158:2–24, Board Order 2–4. Hubbard's disciplinary record entailed:

1. Receipt of a written warning for three $10 drawer shortages across three different days. J.A. 115.

2. Receipt of a final written warning for three additional $10–$20 drawer shortages across five different days. J.A. 114.

3. Curaleaf firing Hubbard for yet another $20 drawer shortage. J.A. 113.

In total, Hubbard had seven distinct cash-handing violations. There is no record evidence that Hubbard was engaged in union activity. Board Order 4 n.13.

The Board observed that Hubbard had been discharged for his seventh cash-handling infraction, while Keane had been discharged after only her second cash-handling infraction. Board Order 4. Because, in the Board's view, Curaleaf had "afforded more leniency" to Hubbard than it did to Keane, the Board concluded that Curaleaf had not applied its discipline policy consistently. *Id.*

At *Wright Line* step two, the Board rejected Curaleaf's argument that it had followed its neutral four-step discipline policy when firing Keane. Board Order 3–4. In doing so, the Board focused on its conclusion that Curaleaf had enforced its policy more harshly against Keane, a union activist, than against Hubbard, an employee uninvolved in union activities. *Id.*

Curaleaf countered that Keane's allotment errors were more serious because they violated Arizona medical marijuana regulations and endangered Curaleaf's operating license. Board Order 4. The Board responded that Arizona law also requires Curaleaf to maintain accurate financial records, and cash-handling mistakes could similarly cause Curaleaf, an all-cash business, to fall out of compliance. *Id.* Because both cash-handling mistakes and allotment errors can pose a risk to Curaleaf's operating license, the Board rejected Curaleaf's argument about the relative seriousness of the two employees' violations. *Id*.

Based on those findings, the Board concluded that, while Curaleaf could have fired Keane for her final cash-handling error, Curaleaf had not proved that it would have fired her without her union activity. Board Order 4–5 (citing *Wendt Corp.*, 369 NLRB No. 135, slip op. at 3 (2020)).

The Board also upheld the notice-reading and union-access remedies. Board Order 5. The Board found those exceptional remedies to be appropriate because Curaleaf "engaged in serious unfair labor practices that struck at the heart of employees' Section 7 rights[.]" *Id.* The Board explained that notice reading was "particular[ly]" appropriate because of Keane's discharge, as "[t]he Board has long recognized that * * * unlawful terminations are destructive to" workers' rights, "especially * * * in cases such as this when the person terminated is the sole union organizer." *Id.* And the Board found that union access was needed because Curaleaf "deprived its employees of access to accurate information about a union" by firing Keane. Board Order 5 & n.20.

The dissenting Board member argued that Curaleaf had met its burden at *Wright Line* step two, and that "a fair comparison [between Keane and Hubbard] shows that, if

anything, [Keane] was treated more leniently" than Hubbard. Board Order 8–9. The dissenting member also objected to the Board's notice-reading and union-access remedies. Board Order 10.

## II

The Board had jurisdiction under 29 U.S.C. § 160(a). We have jurisdiction under 29 U.S.C. § 160(e) and (f).

Our review of the Board's unfair labor practice decisions "is tightly cabined[,] and we afford the Board a 'high degree of deference.'" *Inova*, 795 F.3d at 80 (quoting *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 419 (D.C. Cir. 1996)). We will uphold a decision of the Board if its findings are supported by substantial evidence, it applies the proper legal standard, and it does not depart from precedent without reasoned explanation. *Id.*

Our review of the Board's remedies is similarly deferential. "The Board's discretion in fashioning remedies under the Act is extremely broad and subject to very limited judicial review." *Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 738 (D.C. Cir. 2015) (quoting *St. Francis Fed'n of Nurses & Health Pros. v. NLRB*, 729 F.2d 844, 848 (D.C. Cir. 1984)).

## III

We hold that the Board's finding that Curaleaf unlawfully fired Keane is not supported by substantial evidence. Because the Board imposed the notice-reading and union-access remedies in response to Curaleaf's firing of Keane, those remedies cannot be enforced. We grant the Board's cross-application for enforcement as to the uncontested unfair labor practices.

**A**

We need not decide whether the Board properly concluded that *Wright Line* step one was satisfied because the Board's finding at *Wright Line* step two is not supported by substantial evidence. The record demonstrates that Curaleaf adhered to its neutral discipline policy and so would have fired Keane regardless of her union activity. The record also contains no evidence of disparate treatment based on union activity.

Under Board precedent, an employer that follows its established discipline policy carries its *Wright Line* step two burden "absent evidence of disparate treatment." *Mid-Mountain Foods, Inc.*, 350 N.L.R.B. 742, 743 (2007); *see Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475–476 (D.C. Cir. 2020).

Curaleaf explained to the Board that Keane's discharge was a straightforward application of Curaleaf's established discipline policy. *See* Board Order 3. By the time of her termination, Keane had already committed and been cited for eleven violations of Curaleaf policy. She had also received the appropriate warnings prescribed for each of the preceding three discipline stages: a verbal warning, a written warning, and a final written warning. The Board did not dispute either Keane's lengthy pattern of violations or that her discharge fell squarely within the discipline policy's terms.

Instead, the Board found that Curaleaf had not met its burden of proof at *Wright Line* step two because, in its view, Curaleaf's discipline policy "removes any strict adherence to [Curaleaf's] 4-step disciplinary process by reserving to [Curaleaf] 'the right in its sole discretion, to combine or skip progressive discipline steps[.]'" Board Order 3. The Board also found that Curaleaf "did not grant Keane the same leniency that it granted" Hubbard. Board Order 4.

Neither of those findings is supported by substantial evidence.

**1**

Begin with the Board's finding that Curaleaf's policy did not require strict adherence to each step of its discipline policy. The problem for the Board is that, while Curaleaf reserves its discretion to skip discipline steps, Curaleaf never exercised that discretion against Keane. Quite the opposite. Keane received every chance to correct her behavior that the policy offers. Curaleaf, in other words, hewed to each step of its discipline policy.

Remember that Curaleaf first reviewed Keane's ability to continue working successfully as a budtender after she made seven allotment errors in one transaction, including failing to check a patient's medical marijuana card and failing to log the transaction as required by Arizona law. *See* J.A. 134; Tr. 139:3–142:11. After the Curaleaf Gilbert general manager discovered the mistakes, he emailed senior Curaleaf management about the transaction and expressed "concern[] that [Keane] is not cut out for budtending" because in his "[four] years of management [he had] never come across a transaction that is quite this bad." J.A. 139. A Curaleaf Arizona manager replied: "Holy cow that is definitely by definition a night mare transaction. I do believe we *need* to follow t[he] progressive disciplinary policy and the written [warning] is the correct path to go." J.A. 139 (emphasis added). Similarly, the Curaleaf Arizona manager later testified before the administrative law judge that Keane's seven-error transaction was "the most horrendous transaction" he had seen in his five-and-a-half years. Tr. 139:10. Nothing in the record suggests (and the Board never found) that any of these often-contemporaneous expressions were insincere or pretextual.

Curaleaf again considered Keane's tenure after her second transaction with allotment errors. In that transaction, Keane "r[ang] up a patient under an incorrect profile with an expired medical card and fail[ed] to inform management of the mistake." Board Order 2; J.A. 136–137. The Curaleaf Gilbert general manager emailed Curaleaf Arizona's human resources director about the transaction, asking for permission "to give [Keane] a final written warning or terminate her position[.]" J.A. 142–143. In response, the human resources director—who had just days earlier become aware of Keane's union organizing activities—agreed that Keane's error was "extreme[.]" J.A. 142. Nonetheless, she declined to fire Keane, explaining that, "[b]ecause [Keane's] last [warning] was a verbal/written we will *need* to make this her last and final warning." J.A. 142 (emphasis added). The director added that any future infractions "would result in termination." J.A. 142.

That Curaleaf management found Keane's growing pattern of errors to be so unprecedentedly and nightmarishly egregious, but nonetheless recognized that they *needed* to follow the discipline policy, speaks volumes to Curaleaf's commitment to that policy.

More relevantly, Curaleaf's forbearance continued even after Curaleaf learned of Keane's union activity. Tr. 162:2–8. Instead of wielding its discretion to skip the final written warning and fire Keane, Curaleaf adhered to its discipline policy and gave Keane one more chance.

Nothing in how Curaleaf allowed Keane chance after chance to correct her serious misbehavior remotely suggests a misuse of its discretion or the slightest deviation from its discipline policy. Rather, Curaleaf forwent its discretion and gave Keane every opportunity to continue her employment both before and after learning of her union activity.

14

The Board does not meaningfully address those facts. Instead, it relies on two quotations from Curaleaf managers to demonstrate that Curaleaf was not bound to follow its progressive discipline policy. First, one low-level manager mistakenly told Keane that it would take "at least four cash handling incidents to be fired." Board Order 4 (quotation marks omitted). The Board believes this statement exemplifies Curaleaf's discretion under its policy because it "calls into question [Curaleaf's] claim that employee discipline, in practice, has historically been administered in accordance with its written policy." Board Order 4 n.14; Board Br. 31. Second, another Curaleaf manager opined that, "since we have given [Keane] a final written warning I think [the final $20 shortage] *could* be her last." Board Br. 32 (emphasis added by Board) (quoting J.A. 109). The Board reasons that the manager's equivocation proves that Curaleaf had discretion under its policy. Board Br. 32.

The Board's reliance on these quotations misses the mark. No one disputes that Curaleaf had discretion to cut short the steps in its discipline policy. But the mere existence of unexercised discretion is not by itself sufficient to demonstrate that Curaleaf deviated from its settled policies to fire Keane. *See Stern Produce v. NLRB*, 97 F.4th 1, 15–16 (D.C. Cir. 2024) (holding that the Board's finding of disparate treatment was not supported by substantial evidence because the employer followed its progressive discipline policy, even though the employer had discretion to skip steps). What matters instead is *how* Curaleaf exercised its discretion in Keane's case. The record demonstrates that Curaleaf stuck to its policy by moving through every one of its prescribed discipline steps even in the face of Keane's nightmarish pattern of violations.

**2**

The Board also rested its decision on its conclusion that Curaleaf had treated Keane more harshly than it had treated Hubbard. The record forecloses that finding. Keane was fired for her twelfth violation, while Hubbard was fired for his seventh violation. *See* Board Order 2, 4.[1] That discrepancy indicates that Curaleaf treated Keane more leniently than it did Hubbard. Furthermore, Curaleaf fired both Hubbard and Keane for their first $20 drawer shortage only after they had received final written warnings. That shows consistency, not disparity, in Curaleaf's treatment of union and non-union employees.

The Board reasoned that Curaleaf's treatment of Hubbard and Keane was inconsistent because "Keane's only comparator, Hubbard, accrued 7 cash-handling *violations*," while "Keane was disciplined for four separate *transactions*, [and] had only 2 cash-handling discrepancies when [Curaleaf] fired her." Board Order 4 (emphases added). That analysis contains at least three serious missteps.

First, the comparison between transactions and mistakes compares apples to oranges because Keane's erroneous

---

[1] Some of the warnings issued to Keane and Hubbard may have double-counted some violations. *See* Board Order 8 n.4, 9 n.10 (Member Ring, dissenting); Curaleaf Br. 25 n.8. It appears that Keane committed eleven or twelve distinct infractions, while Hubbard committed six or seven. Because the Board's majority found that Keane had twelve errors and Hubbard had seven, Board Order 2, 4, and neither party has demonstrated that these findings are clearly erroneous, we defer to the Board's counting. At any rate, the exact number of violations does not change the bottom line: Keane had more total violations than did Hubbard.

transactions contained multiple mistakes—including one transaction that had seven mistakes. *See* Board Order 2.

Second, the Board's focus on Keane's cash-handling mistakes takes too narrow a view of the record. The Board ignored the fact that Curaleaf does not distinguish between types of mistakes when escalating discipline. Curaleaf's human resources director testified that "all performance is lumped into the one bucket[,]" and that Curaleaf does not distinguish between cash-handling and allotment errors. Tr. 153:23–154:7. That testimony was unrebutted.

The Board never acknowledged, let alone grappled with, this evidence, even though the record reflects that Curaleaf acted consistently with that approach. Specifically, Curaleaf did not distinguish between cash-handling and allotment errors when progressing Keane's discipline. Curaleaf gave Keane a verbal warning after a cash-handling error, issued Keane written warnings after transactions with multiple allotment errors, and fired Keane after a final cash-handling error. In other words, Curaleaf fired Keane not for her second cash-handling error, but for her twelfth overall error. As such, the record does not show that Curaleaf tolerated more mistakes from Hubbard; it shows that Curaleaf tolerated more mistakes from Keane.

Third, the Board erred when rejecting Curaleaf's argument that Keane's errors were more serious than Hubbard's. The Board found that both cash-handling and allotment errors "implicate[] compliance issues set forth in" Arizona medical marijuana law, so Keane's and Hubbard's errors "were equally severe." Board Order 4. Yet if Hubbard's and Keane's individual mistakes were equally severe, then Keane's twelve errors are still cumulatively worse than Hubbard's seven errors.

The Board simply ignored all of this evidence. That will not do. The Board cannot ground its decisions in a skewed or "clipped view" of the record. *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003). Nor can it "fail[] to grapple with [Curaleaf's] formal rules and standard practices" as evidenced in the record. *Stern Produce*, 97 F.4th at 15. Its finding of disparate treatment has no anchor in the full record and cannot be sustained.

Because the Board's reading of the record is not "reasonably defensible[,]" we grant Curaleaf's petition for review as to the unlawful-discharge finding and deny the Board's cross-application for enforcement. *Dean Transp., Inc. v. NLRB*, 551 F.3d 1055, 1061 (D.C. Cir. 2009) (quoting *Pennsylvania Transformer Tech., Inc. v. NLRB*, 254 F.3d 217, 224 (D.C. Cir. 2001)). We also deny the Board's cross-application for enforcement as to the reinstatement and backpay remedies that were imposed to redress Keane's termination.

**B**

For similar reasons, we grant Curaleaf's petition for review and deny the Board's cross-application for enforcement as to the Board's notice-reading and union-access remedies.

Notice reading and union access are extraordinary remedies, and the Board must explain why they are necessary to address some particularized need unmet by ordinary remedies. *United Food & Com. Workers Int'l Union, AFL-CIO v. NLRB*, 852 F.2d 1344, 1348 (D.C. Cir. 1988) ("[W]e will not enforce [notice-reading] orders when the record fails to indicate 'particularized need' for the order.") (quoting *Teamsters Local 115 v. NLRB*, 640 F.2d 392, 403 (D.C. Cir. 1981)); *United Steelworkers*, 646 F.2d at 640 (declining to enforce a union-access remedy where Board made "a

conclusory assertion in a footnote that extraordinary remedies were 'essential'"). Such extraordinary remedies can only be justified as "remedial action" for specific, flagrant violations that have already occurred, and cannot be justified as preventative "punitive measures" designed to deter future violations. *Florida Steel Corp. v. NLRB*, 713 F.2d 823, 828 (D.C. Cir. 1983) (formatting modified); *see id.* at 835.

Here, the Board's central justification for those exceptional remedies was to address the effects of Curaleaf's firing of Keane. The Board explained that it was ordering notice reading because Curaleaf "engaged in serious unfair labor practices[.]" Board Order 5. The Board called out Keane's dismissal "[i]n particular," explaining that "[t]he Board has long recognized that unlawful terminations are destructive to [workers'] rights, * * * especially * * * in cases such as this when the person terminated is the sole union organizer." *Id.* (formatting modified). Similarly, the Board ordered union access because Curaleaf "deprived its employees [of] accurate information about a union" by firing Keane. *Id.*

Because Curaleaf's firing of Keane was lawful, the Board's explanation for imposing notice-reading and union-access remedies comes up short. We therefore vacate the portion of the Board's decision ordering those remedies. *See Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 692–693 (2d Cir. 2019) (declining to enforce notice-reading remedy after the court overturned an unlawful-discharge finding).

## C

Finally, Curaleaf does not dispute that it violated the National Labor Relations Act by (1) threatening employees' tips if they unionized; (2) promising employees benefits if they did not unionize; and (3) creating an impression of surveillance. Curaleaf also abandoned any challenge to those

findings before the Board. Curaleaf Br. 11 n.6. We therefore summarily enforce the Board's findings and order as to those three uncontested labor violations. *See, e.g.*, *Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012).[2]

**IV**

Because the Board's decision that Curaleaf unlawfully fired Keane is not supported by substantial evidence, we grant Curaleaf's petition for review and deny the Board's cross-application for enforcement to the extent that it seeks to enforce the unlawful discharge finding and the notice-reading and union-access remedies. We grant the Board's cross-application for enforcement as to the three uncontested unfair labor practices.

*So ordered.*

---

[2] The Board did not find that Curaleaf's uncontested violations alone justify the notice-reading and union-access remedies, so that question is not before us. Having granted Curaleaf's petition on statutory grounds, we likewise express no view on Curaleaf's constitutional challenges to those remedies. Finally, the court expresses no view on the merits of the agency-authority issue raised in the concurring opinion because neither party raised it before either this court or the Board. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–666 (1982).

WALKER, *Circuit Judge*, concurring:

Congress empowered the National Labor Relations Board to protect the labor rights of certain employees of certain employers that affect interstate commerce.[1] It is an undeniably broad grant of jurisdiction. But it may not be quite as broad as the NLRB assumes.

Consider the facts of this case. The NLRB ordered a criminal enterprise called Curaleaf Gilbert to pay a drug dealer to sell illegal drugs.[2] That is a curious order from the branch of government tasked with faithfully executing federal law.[3]

I can imagine three arguments in favor of the NLRB's jurisdiction over marijuana dispensaries like Curaleaf, but each has flaws.

First, many people believe marijuana should be legal. There are thoughtful people on both sides of that policy debate, and momentum may well be toward legalization.[4] But for now, marijuana remains illegal at the federal level, notwithstanding the Department of Justice's nonenforcement.[5]

---

[1] *See* 29 U.S.C. § 152(2), (3), (7).

[2] *See generally* 21 U.S.C. §§ 812(c), 841(a), 844(a) (prohibiting cultivation, distribution, or possession of marijuana).

[3] U.S. Const. art. II, § 3.

[4] *See, e.g.*, Schedules of Controlled Substances: Rescheduling of Marijuana, 89 Fed. Reg. 44597-01 (proposed May 21, 2024).

[5] *See, e.g.*, Department of Justice, Memorandum to United States Attorneys: Guidance Regarding Marijuana Enforcement, at 3-4 (2013), https://perma.cc/F4FX-LXV3.

Second, Arizona law allows Curaleaf to sell marijuana.[6] But federal criminal prohibitions preempt conflicting state law.[7] And those prohibitions cannot be displaced by an agency advisory memo.[8]

Third, the NLRB usually retains jurisdiction even after an employer breaks a law. Indeed, Congress tasked the NLRB with holding employers accountable when they violate federal labor law. But that's when the enterprise is otherwise legitimate — not necessarily when its sole aim is to sell an illegal product or provide an illegal service.[9]

That distinction may be more significant than the NLRB appreciates. After all, rings of bookies and counterfeiters affect interstate commerce, but the NLRB does not seem eager to adjudicate their labor disputes. Ditto for street gangs.

Why does that change when a corner boy calls himself a "budtender" and his crew incorporates under state law?

To me, at least, the answer is hazy.

---

[6] Ariz. Rev. Stat. Ann. §§ 36-2852, 36-2854 (2020).

[7] U.S. Const. art. VI, cl. 2.

[8] *See, e.g.*, NLRB, Advisory Memorandum: High Level Health, at 3-4 (2015), https://perma.cc/Z6Y8-VDVV; NLRB, Advisory Memorandum: Wellness Connection of Maine, at 10 (2013), https://perma.cc/5H53-HYMG.

[9] *Cf. Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 892-93 (1984).